[No. A099569. First Dist., Div. Three. Apr. 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
TRAVIS WELLS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exceptions of Discussion Part I.B. and Discussion Part II.

COUNSEL

Tara M. Mulay, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A Chacon and Ryan B. McCarroll, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PARRILLI, J.**—A jury found Travis Wells guilty of several sex offenses against two minors, and, as a "Three Strikes" defendant, he was sentenced to a total of 280 years to life imprisonment. Among other arguments in this appeal, appellant claims the trial court erred in excluding testimony by a defense expert witness regarding the "usual" reactions of trauma victims, which was offered to show the demeanor of one of the minors was inconsistent with having been molested. We reject this argument and conclude appellant's other claims do not establish reversible error. Accordingly, we affirm the judgment.

## BACKGROUND

### I. *Prosecution Case*

#### A. *Background*

Nanette Francois and Jerry Wells began living together in 1988 and had a daughter, J., in October of that year. The couple stopped living together in 1992. In April 1995, Francois had a second daughter, M., with a different man. That same year, Francois began serving a federal prison sentence for drug trafficking. She left J. to live with a family friend, while M. stayed with her grandmother. In 1996, while Francois was still in prison, Jerry Wells successfully obtained a court order granting him custody of J. He immediately brought J. to live in the Redwood City home of his mother, Eva Barr.

When she was released from prison in 1999, Francois took custody of M. and moved into an apartment. In August 2000, Francois agreed to let M. live at Barr's home for the upcoming school year. J. and M. shared one bedroom, and a second bedroom was used by Barr and her husband. M. spent weekends with Francois, while J. alternated weekends with Francois and her father. Shortly after M. moved in, appellant, who is Barr's son and J.'s paternal uncle, came to live in the home. He slept downstairs on a rollaway bed.

During the 2000–2001 school year, when events relevant to the charges took place, J. was in seventh grade and M. was in kindergarten.

    B.   *Charged Incidents Involving J.*

J. sometimes accompanied appellant when he visited his girlfriend, Yvette Kotay. Once, in the fall of 2000, appellant and Kotay took J. to East Palo Alto, where J. watched as appellant purchased rock cocaine from a person on the street. Appellant smoked the cocaine, using a cigarette, and offered it to J. She declined. Appellant paid J. $10 to keep quiet.

Sometime after this incident, while the Barrs were out of the house, J. and M. came downstairs and saw appellant having sexual intercourse with Kotay. Appellant bought the girls snacks and told them not to tell their grandparents. On another occasion, appellant asked J. for the key to the apartment complex's laundry room. After J. got the key and followed appellant and Kotay into the laundry room, appellant and Kotay began having sex in front of her. J. started to leave but stopped when appellant ordered her to stay.

The first time appellant touched J. in a sexual manner he grabbed her as she was coming downstairs, pulled her into his lap and touched her breast. Appellant laughed, but J. pushed him away and got up.

One evening in the spring or early summer of 2001, appellant and J. went to the laundry room to retrieve clothes from the dryer. Standing in the laundry room, appellant unzipped his pants and removed his penis. He then pulled J. to him and told her to rub it. J. tried to pull away, but appellant wrapped his arm around her stomach, grabbed her hand and forced her to masturbate him. After two or three minutes, he released J. and told her not to tell her grandmother what had happened. A similar incident occurred in J.'s bedroom one afternoon. With his pants unzipped and penis exposed, appellant pulled J. onto the bed. He held her down with his arm around her waist and forced her to masturbate him. After about two minutes, M. came upstairs and saw them and asked what they were doing. Appellant quickly pulled up his pants and said, "Nothing." M. threatened to tell the others what she saw, but appellant told her not to. After he left the room, J. asked her sister to tell. She was too embarrassed about the incidents to tell someone herself.

One Wednesday evening in early summer 2001, J. went to her room to change clothes before going to Bible study. She found appellant asleep on her bed and told him to leave, but instead he rose and, with an "evil" look, told J. to take off her clothes. Although J.'s grandparents were downstairs, the television was on and turned up very loud due to the grandfather's hearing difficulties. J. removed her clothes because she feared appellant would hurt

her. Appellant then pushed J. onto the bed and held her arms over her head. Although she tried to keep her legs closed, appellant forced them open using his knee. He then proceeded to have sexual intercourse with her. J. had never had sex before. When she started to yell, appellant covered her mouth with one hand. After about five minutes, appellant ejaculated onto the bed's comforter and the floor. Appellant retrieved a towel from the nearby bathroom and wiped up the ejaculate, then pulled up his pants. Before leaving the room, he told J. she had "better not tell" or else he would say J. was having sex with her boyfriend. J. told no one about the incident because she did not want her parents to know she had a boyfriend and she was afraid Barr would not believe her. J. also feared what her mother might do if she found out, since she and Francois had recently watched a movie about Ellie Nesler, and Francois told J. she would kill anyone who touched J., just like Ellie Nesler had done.

About two weeks later, in July 2001, J. went upstairs and again found appellant sleeping on her bed. He gave her the same look he had before and told her to take off her clothes. J. complied and tried to cover her body, but appellant once again pushed her onto the bed, held her hands above her head, and forced her legs open with his knee. After about two or three minutes of intercourse, he stopped.

J. thought about a television show she had seen in which girls talked about being raped for years, and she feared appellant would try to rape her again. One day, when everyone else was away from the house, J. took a butcher knife from the kitchen and held it over appellant's head while he was sleeping. But appellant woke up, asked what she was doing, and took the knife away from her.

C. *Charged Incidents Involving M.*

Appellant began touching M. before her sixth birthday (in April 2001). Once, in the girls' bedroom, he grabbed M.'s bottom. When M. told him to get off her, appellant pinched her chest, laughing and saying "look at these little boobies." He also kissed M. on the lips and touched her vagina over her clothes. Another time, M. awoke from a nap to find appellant lying on top of her.

D. *Investigation*

M. had moved back in with Francois in June 2001, at the end of the school year, and the family originally intended for J. to live with her mother during the summer as well. However, J. ended up spending the summer at Barr's apartment because she did poorly in school and had to attend summer school.

J. was upset because she wanted to live with her mother. Francois also wanted J. to live with her, and on July 20, 2001, she filed court papers seeking custody of J.

On August 1, 2001, J. ran away. J. went to her friend Rescha's house, but Francois found her there and scolded her for running away. When she returned J. to Barr's home, Francois and Jerry Wells got into a heated and physical argument over who should have custody of J. Francois called the police. Sheriff's deputies Hector Acosta and Craig Denton arrived at the scene. After they separated the fighting couple and began talking about what happened, Deputy Acosta noticed J. sitting away from the others, crying heavily. He asked if she was okay, and J. told him her uncle "had put his private parts in her private parts." She briefly told the deputy details about the two rapes. J. told Acosta she was afraid of her uncle but was also afraid her mother would kill him if she found out what happened. Acosta notified other detectives and called child protective services (CPS).

Detective Denton interviewed appellant at the scene. Appellant denied molesting J. and stated he never hugged or touched her in any way. He said Barr told him never to touch the girls because M. had been acting out sexually, "humping the floor and stuff," and M's school reported that she had kissed another little girl on the mouth. Appellant also denied having sex with Kotay in the apartment or the laundry room.

On August 2, Detective Gary Ramos interviewed J. at a CPS center. In a videotaped session, J. told Ramos about the two rapes and the time she was forced to watch appellant and Kotay having sex in the laundry room. On August 9, a pediatrician examined J. and determined she had "definite evidence of vaginal penetration." J.'s hymen had "notches" representing, the doctor believed, healed tears of the tissue. On August 10, members of the county's crime lab searched Barr's house and found a semen stain on the mattress pad of J.'s bed. DNA testing indicated this stain was made by appellant. However, when appellant was interviewed later in the month, he said he had recently had sex with Kotay in J.'s room—both on top of the bedspread and under the sheets.

In the fall of 2001, M.'s teacher told Francois M. had been acting out in a sexual manner at school and, most recently, had said something inappropriate to another child on the playground. Francois also learned that, earlier in the year, Barr had arranged for M. to see a therapist because of similar behavior.

On September 11, 2001, police officers interviewed M. for the first time. M. reported that appellant had "touched her on the butt and kissed her on the lips." When she was interviewed that day, J. mentioned for the first time her

trip with appellant to East Palo Alto to buy drugs. Asked again about the laundry room incident with appellant and Kotay, J. now thought it happened after the rapes, not before. In a separate interview on November 7, M. added that, in addition to touching her bottom and kissing her, appellant had touched her "private part" and one time she awoke from a nap to find her uncle lying on top of her. In a final interview of both girls on December 26, 2001, J. told police about the two times appellant forced her to masturbate him. Regarding the time she awoke with appellant on top of her, M. added that he was rubbing his private part into hers. She also said appellant made her touch his "private" but then stopped because her grandmother came home.

Appellant was charged with committing aggravated sexual assault on J. (Pen. Code, § 269, subd. (a)(1)),[1] four counts of forcible lewd acts on J. and three counts of forcible lewd acts on M. (§ 288, subd. (b)), two counts of nonforcible lewd acts on M. (§ 288, subd. (a)), annoying or molesting J. (§ 647.6, subd. (a)), endangering J. (§ 273a, subd. (b)), and contributing to the delinquency of J. (§ 272, subd. (a)(1)). The information further alleged appellant committed sexual offenses against more than one victim (§ 667.61, subd. (e)(5)) and had suffered two prior serious felony convictions.

## II. *Defense Case*

At trial, Jerry Wells's wife testified she found a torn-up note in J.'s notebook. The note, which was taped together and admitted into evidence, appeared to be a handwritten colloquy between two people. One reported she had sex with her first boyfriend, Deshon, when she was 10 years old. The note also said, "I might do it again next week," which was followed by the remark, "Do it." J. denied writing any part of the note, claiming it had been written by her friend Paige. A document examiner testified for the defense that, in his expert opinion, the note contained handwriting by two individuals but statements describing intercourse with the boyfriend were written by J. A second document examiner testifying for the defense concluded the entire note was written by J.

The defense also presented expert testimony from an emergency room physician who had reviewed photographs from J.'s internal examination and concluded J. had not had intercourse. He suggested any abnormalities in the hymen were caused by a previous vaginitis infection. In rebuttal, the prosecution called the chief of pediatrics at San Mateo County General Hospital. He concluded the photographs demonstrated a residual trauma to the hymen that could only have been caused by penetration, and could not have resulted from a vaginal infection.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

The jury found appellant not guilty of two counts alleging forcible lewd acts committed against M. but guilty of the remaining 11 counts. The court found true the allegations regarding appellant's prior strike convictions, and on July 18, 2002, the court sentenced appellant to a total of 280 years to life in prison. This sentence reflects six consecutive terms of 45 years to life (based on 15-year terms that were tripled pursuant to § 1170.2) plus two consecutive five-year terms pursuant to § 667, subd. (a), with all remaining terms to be served concurrently.

## DISCUSSION

### I. *Expert Testimony Regarding Sexually Abused Children*

■ Appellant's two main arguments on appeal concern expert testimony on the traumatic effects of child sexual abuse. We review the trial court's admission and exclusion of expert testimony for abuse of discretion. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196 [103 Cal.Rptr.2d 908].)

### A. *Defense Testimony About Manifestations of Trauma*

After J. testified at trial, Dr. Anthony Urquiza testified for the prosecution as an expert in child sexual abuse and the child sexual abuse accommodation syndrome (CSAAS). Without objection from the defense, Dr. Urquiza described the five elements or stages exhibited in the syndrome: secrecy, helplessness, entrapment/accommodation, delayed or unconvincing disclosure, and retraction. He explained that perpetrators often manipulate or coerce the child into keeping quiet, and children generally do not disclose the abuse immediately. When an abused child does disclose, it is typically an extended process in which more and more disclosures come over time, as the child grows more comfortable talking about the abuse, and the child's story often varies with each retelling. Dr. Urquiza did not tie his testimony about CSAAS with any behavior by J. or M. After this expert testified, and again at the close of evidence, the jury was instructed pursuant to CALJIC No. 10.64 that it could not consider evidence regarding CSAAS as proof a molestation had occurred.[2]

---

[2] As read in this case, CALJIC No. 10.64 states: "Evidence has been presented to you concerning child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. [¶] Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with an assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. [¶] You should consider the evidence concerning this syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

The defense later called its own rape trauma/CSAAS expert, Dr. Diane Sullivan Eversteine. In an Evidence Code section 402 hearing, Dr. Eversteine announced she had reviewed videotapes of J.'s interviews and she intended to testify that J. did not exhibit the emotional reaction one would expect from a petite girl who had been raped by a large man. Based on her experience working with trauma victims, Dr. Eversteine believed J.'s demeanor was inconsistent with having suffered trauma.

The trial court concluded such testimony regarding whether either of the girls had suffered trauma, based on their demeanor when interviewed, was inconsistent with *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] (*Bledsoe*) and too speculative to be admissible. Although the court initially ruled that Dr. Eversteine could testify in general about manifestations of trauma, so long as the discussion was not tied to the alleged victims, after further argument the court ultimately precluded testimony about the "usual" emotional reactions of trauma victims. The court explained: "My problem with this is what's usual? I mean that's the whole concept of child abuse accommodation syndrome. What's usual? There's nothing usual. Everybody acts differently. That's what strikes me as remarkable here that we're using child abuse accommodation syndrome in the inverse[,] that we're using it as a sword, not as a shield. [¶] . . . [¶] I'm having [a] problem with the concept of saying usual, I don't think that's appropriate. . . . And *Bledsoe* basically talks about this, you know, that we're trying to dispel the common themes and theories of the average rape victim because there ain't no average rape victim. Now, we're going to turn around and say there is, and she didn't meet the criteria. [¶] So having now thought about it, I'm not going to allow you to ask . . . what do you expect in . . . usual circumstances. You can talk about what manifestations occur, you know, but that's going to create a fairly large variety of manifestations, but not usual. I don't see that as relevant."

Appellant challenges these rulings as a denial of due process and his Sixth Amendment right to compulsory process. Characterizing Dr. Eversteine's testimony as concerning the "usual disclosure behavior of child sexual abuse victims who have suffered a penetrative trauma," appellant insists it was unfair for the trial court to deny him an opportunity to present this testimony to rebut the prosecution's argument, presented through Dr. Urquiza's CSAAS testimony, that J.'s disclosure behavior was " 'not inconsistent' " with having been sexually abused. We conclude the trial court correctly excluded the proferred testimony.

■ In *Bledsoe, supra,* 36 Cal.3d 236, the Supreme Court considered the admissibility of expert testimony regarding the "rape trauma syndrome." The court concluded such testimony is not sufficiently reliable, pursuant to Evidence Code section 801 and *People v. Kelly* (1976) 17 Cal.3d 24 [130

Cal.Rptr. 144, 549 P.2d 1240], to be admissible as proof that a complaining witness who suffers from rape trauma syndrome was in fact raped. (*Bledsoe, supra,* at p. 251.) Unlike other scientific evidence, the court observed, "rape trauma syndrome was not devised to determine the 'truth' or 'accuracy' of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients." (*Id.* at pp. 249–250.) Because the syndrome is not generally relied upon in the rape counseling community for the purpose of proving that a rape occurred, expert testimony relying on the syndrome cannot be admitted for this purpose at trial. (*Id.* at p. 251.) Even so, the court in *Bledsoe* suggested evidence about the syndrome could be admitted for other purposes, and indeed could "play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*Id.* at pp. 247–248.)

Thereafter, "[r]elying on *Bledsoe,* numerous Court of Appeal decisions have held that *Kelly-Frye* [*People* v. *Kelly, supra,* 17 Cal.3d 24, and *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013] similarly precludes an expert from testifying based on the child sexual abuse accommodation syndrome (CSAAS) that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children. [Citations.]" (*People v. Bowker* (1988) 203 Cal.App.3d 385, 391 [249 Cal.Rptr. 886] (*Bowker*).) Thus, by now, "[i]t is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [32 Cal.Rptr.2d 345].) As the court explained in *Bowker*: "Fundamentally, *Bledsoe* must be read to reject the use of CSAAS evidence as a *predictor* of child abuse. It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter—given the current state of scientific knowledge—clearly is not." (*Bowker, supra,* at p. 393.)

Like expert testimony on rape trauma syndrome, however, "CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 [283 Cal.Rptr. 382, 812 P.2d 563]; *People v. Bowker, supra,* 203 Cal.App.3d at p. 391.)" (*People v. Patino, supra,* 26 Cal.App.4th at p. 1744.) The evidence must be tailored to address the specific myth or misconception suggested by the evidence. (*Bowker, supra,* at pp. 393–394.)

■ We agree with the trial court that expert testimony concluding a complaining witness has *not* been raped or molested, based on the witness' demeanor after the alleged incident, turns the holding of *Bledsoe* on its head. Having reviewed videotapes of J.'s interviews, Dr. Eversteine intended to testify that J.'s calm demeanor was inconsistent with the "usual" emotional reactions exhibited by trauma victims. The evidence was only relevant in that it tended to show a molestation did not occur, i.e., because J. was not traumatized. This is precisely the sort of backward-focused, judgmental analysis of victim behavior *Bledsoe* prohibited. As in *Bledsoe*, the defense made no showing that child abuse counselors (or any relevant professionals) routinely rely on a child's display of emotional behavior when describing a trauma to judge credibility and determine whether the child was in fact traumatized.

Even if there were such a showing, which we strongly doubt could be made, the conclusion would still be highly speculative absent a foundation that every molested child invariably displays the emotional response described by Eversteine. (Cf. *State v. McQuillen* (1984) 236 Kan. 161 [689 P.2d 822, 830]. ["There are no statistics to show that there is any value to a negative finding that the rape trauma syndrome is not exhibited by the alleged victim"]; see also *Bledsoe, supra,* 36 Cal.3d at p. 241, fn. 4 [discussing a "seminal" 1974 study of rape trauma syndrome in which "13 of the 92 subjects showed no symptoms and denied having any symptoms when specifically asked"].)

■ Unlike evidence about CSAAS and rape trauma syndrome that is admissible under *Bledsoe* and *Bowker*, Dr. Eversteine's proposed testimony about the "usual" demeanor of trauma victims is not relevant to correct any common myth or misconception about the behavior of children who have been molested. If anything, her proposed expert testimony would likely reinforce a commonly held belief that traumatized victims will become emotionally disturbed or tearful when describing a traumatic event. Because the defense identified no common misperception the jury might hold about victim behavior that Dr. Eversteine's testimony was narrowly tailored to rebut, her proposed testimony was little more than expert opinion as to J.'s credibility. Jurors are generally considered to be equipped to judge witness credibility without the need for expert testimony. (*People v. Smith* (2003) 30 Cal.4th 581, 626–628 [134 Cal.Rptr.2d 1, 68 P.3d 302] [trial court properly excluded psychiatrist's expert testimony that defendant's tape-recorded confession expressed true remorse]; *People v. Anderson* (2001) 25 Cal.4th 543, 576 [106 Cal.Rptr.2d 575, 22 P.3d 347] [" 'the psychiatrist may not be in any better position to evaluate credibility than the juror' "].)

Appellant glosses over these differences when he argues he had a right to present expert testimony in rebuttal to the CSAAS testimony offered by prosecution expert Dr. Urquiza. But, unlike the proposed defense testimony, Dr. Urquiza said *nothing* about the demeanor one would expect of a child molestation victim while describing abusive incidents. Without tying his testimony to either of the complaining witnesses, he merely explained the five stages or components that have been clinically identified as comprising CSAAS. This testimony was admissible under *Bledsoe* and *Bowker* because J.'s testimony on direct and cross-examination revealed she had not immediately reported the alleged abuse, and when she eventually did tell adults her disclosures were piecemeal and sometimes contradictory in the details. The jury was instructed to consider this testimony only as evidence suggesting J.'s disclosure behavior was not necessarily inconsistent with having been molested. By contrast, the excluded testimony from Dr. Eversteine did not concern CSAAS, and it was not responsive to Dr. Urquiza's testimony about the syndrome. The limits the trial court placed on the defense's "trauma" testimony were, after all, quite consistent with those limits constraining prosecution evidence concerning CSAAS. The experts were permitted to describe general aspects of each psychological phenomenon, but each was precluded from applying such psychological evidence to render an opinion as to whether J. or M. was truly molested. Because the jury would likely have understood Dr. Eversteine's proposed testimony about "usual" reactions from a trauma victim as a veiled opinion that J., who did not exhibit such "usual" behaviors, was not truly molested, the trial court properly excluded this testimony as well.

Appellant's out-of-state cases do not persuade us otherwise. In *People v. Wheeler* (1992) 151 Ill.2d 298 [602 N.E.2d 826, 831–832, 176 Ill.Dec. 880], the Illinois Supreme Court held that when the state uses evidence of rape trauma syndrome to prove the victim was assaulted, the defendant's expert must be permitted to examine the victim to determine whether she does in fact suffer from the syndrome. (See also *Henson v. State* (Ind. 1989) 535 N.E.2d 1189, 1192–1193 [defense expert's testimony that complaining witness' behavior was inconsistent with a victim of a traumatic rape was admissible to show the alleged rape did not occur]; *State v. McQuillen, supra,* 689 P.2d at p. 830 [to rebut prosecution expert testimony, defense may present expert to testify alleged victim is not suffering from rape trauma syndrome].) However, unlike California, each of these states allows rape trauma syndrome evidence to be admitted as substantive proof that a sexual assault in fact occurred. (See *People v. Wheeler, supra,* at p. 831 ["evidence

of rape trauma syndrome is substantive evidence that a sexual assault occurred"]; *Henson v. State, supra,* at p. 1193 ["There is little doubt that an alleged rape victim's conduct after the fact is probative of whether a rape in fact occurred"]; *State v. Marks* (1982) 231 Kan. 645 [647 P.2d 1292, 1299–1300] [evidence a victim suffers from rape trauma syndrome is relevant and admissible to show nonconsensual sexual assault occurred].) ▮ Under *Bledsoe,* California prosecutors are prohibited from using a victim's manifestations of rape trauma syndrome as evidence a rape occurred; thus, there is no reason why a defendant should be allowed to rely on the absence of such manifestations as proof a rape did not occur. In short, the fairness rationale expressed in appellant's out-of-state cases has no application here.

B. *Prosecution Testimony About Sexually Inappropriate Behavior**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Instructions and Definitions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Corrigan, Acting P. J., concurred.

**POLLAK, J.,** Concurring.—I join in the decision of the majority, but on a much narrower basis than set out in part I of the Discussion in the majority opinion.

Defendant's expert, Dr. Diane Sullivan Eversteine, was prohibited from testifying that victims of child sexual abuse usually display certain signs of trauma that defendant argued were not apparent in the videotaped interview of the alleged victim, J., and which therefore tended to show that J. had not been molested as the prosecution claimed.[1] Although the trial court initially

---

*See footnote, *ante,* page 179.

[1] Defendant's initial proffer was that Dr. Eversteine would testify as to what the usual signs of such trauma are, and that after viewing the videotape it was her opinion that J's demeanor was inconsistent with having suffered such trauma. I do not presently quarrel with the trial court's ruling that Dr. Eversteine could not express the latter opinion because the jury was capable of viewing the videotape and judging for itself whether J.'s behavior reflected signs of trauma. Even this conclusion, however, I believe is questionable, since a trained expert like Dr. Eversteine undoubtedly is more qualified than a layperson to identify behavior that reflects or is inconsistent with trauma. " 'The jury need not be wholly ignorant of the subject matter of

indicated that such testimony would be permitted, the court reconsidered and would not allow the defense to ask the expert how trauma is usually manifested. According to the trial judge, "What's usual? There's nothing usual. Everybody acts differently." The judge permitted the expert to testify to "what manifestations occur . . . but not usual. I don't see that as relevant. I don't see the probative value." From *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] (*Bledsoe*), the trial court drew the conclusion, as does the majority, that since "common themes and theories of the average rape victim" cannot be used to establish that the alleged victim was in fact molested, the situation could not be "turn[ed] around" to show that the alleged victim was not molested.

With all respect, I do not believe any of this reasoning follows. In the first place, whether or not individuals who have been traumatized normally display certain behavior is a question of fact, not one of law. Dr. Eversteine is a respected clinical psychologist, an expert in "the areas of rape trauma and child abuse," and no one disputed her qualifications as such, nor did the prosecutor question the foundation on which she relied to form her expert opinion.[2] Based on her training and her experience with countless trauma victims, she was in a position to describe how such victims usually react. (*People v. McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709], overruled on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265].) The trial judge may have believed that, as he put it, "there ain't no average rape victim," but a qualified expert nonetheless may testify to behavior that is normal under various conditions. Dr. Eversteine made clear that it was not her opinion, and she would not testify, that one would expect to see a particular reaction in any trauma victim, but she would have testified that "there is a range. . . . [Y]ou usually see some kind of a reaction, they shut down, they shake, there's some nonverbal [clues]." The court was in no position to say as a matter of law that the expert was wrong in this respect.

---

the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300 [283 Cal.Rptr. 382, 812 P.2d 563], quoting *People v. McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709].) Nonetheless, defendant does not pursue this issue on appeal but does press the contention that Dr. Eversteine at least should have been permitted to testify to behavior that normally is characteristic of an individual who has experienced the trauma of forcible sexual abuse.

[2] Were the evidence to show that the expert based her opinion on insufficient data or on other matter on which an expert may not reasonably rely (Evid. Code, § 801, subd. (b)), the testimony might properly be excluded on that ground. However, the trial court's ruling was not based upon an evaluation of the sufficiency of the foundational evidence on which Dr. Eversteine based her opinion.

Nor could the court properly conclude that this evidence was irrelevant. The judge undoubtedly was correct that even if "99 out of 100 people usually react this way," that does not prove that the one person who does not was not in fact molested. But certainty is not the test of relevancy or admissibility. (Evid. Code, §§ 210, 351; 1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 26, pp. 351–353.) If individuals who have been traumatized generally react in a certain manner, and the alleged victim does not manifest that behavior, that is a fact that *tends* to show that the person was not traumatized. While the weight of such evidence will depend on numerous additional factors (which of course may be explored on cross-examination), the mere fact that this evidence is not conclusive does not mean that it is not relevant.

Most importantly, the reason for which evidence of rape trauma syndrome or of child sexual abuse accommodation syndrome (CSAAS) may not be used to prove that the alleged victim was in fact raped or molested does not apply in the converse situation. Evidence that the alleged victim displays behavior consistent with either of those syndromes may not be used to prove that the individual was raped or molested because the syndromes were identified and are used solely for the purpose of treatment, not for historical factfinding, and many persons display such behavior for other reasons. (*Bledsoe, supra,* 36 Cal.3d at p. 250; see *State v. McQuillen* (1984) 236 Kan. 161, 177 [689 P.2d 822, 833] (dis. opn. of Schroeder, C. J.) ["The symptoms of rape trauma syndrome, which is a type of post-traumatic stress syndrome, may be caused by any psychologically traumatic or stressful event." (Italics omitted.)].) It does not follow from the fact that one exhibits the elements of the syndrome that one was raped or molested. "The particular aspects of CSAAS are as consistent with false testimony [of the alleged victim] as with true testimony." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [32 Cal.Rptr.2d 345]; cf. *People v. Bowker* (1988) 203 Cal.App.3d 385, 393 [249 Cal.Rptr. 886] [explaining flawed syllogism underlying profile evidence].) As a matter of simple logic, it does not follow from the premise that some people who display certain behavior have been raped or molested, that a particular individual displaying that behavior has been raped or molested. That is the reason for which evidence of the particular syndrome may be used to negate the inference (i.e., to dispel the "misconceptions" discussed in *Bledsoe*) that an individual who acts in conformity with the syndrome has not been raped or molested, while such evidence may not be used to prove the person *was* raped or molested.

The logic is entirely different in proving the negative. "In most instances, presence and absence are not *equally* probative evidence." (Lyon & Koehler, *The Relevance Ratio: Evaluating the Probative Value of Expert Testimony in*

*Child Sexual Abuse Cases* (1996) 82 Cornell L.Rev. 43, 70.) It follows that if individuals who have been traumatized display certain behavior and a particular individual does not display that behavior, the individual was not traumatized.[3] Since the premise is that a traumatized person normally—not always—displays such behavior, the conclusion that follows is not that the person necessarily was not traumatized, but that the absence of that behavior tends to show that she was not. The reasoning of *Bledsoe* tells us that if the particular signs of trauma may be produced by *causes other than rape or molestation*, one cannot infer rape or molestation from the presence of those signs. However, if those signs normally accompany a traumatic event such as a rape or sexual molestation and the person in question does not display those signs, it is entirely logical to consider that absence in determining whether such an event occurred.

The reason for which I concur in the disposition of this case, despite my view that the trial court erred in prohibiting defense counsel from asking Dr. Eversteine about the usual manifestations of trauma, is that Dr. Eversteine nonetheless conveyed that information in her testimony. While the point likely would have been made more clearly and more emphatically in the absence of the court's ruling, Dr. Eversteine did describe what she regards as manifestations of trauma. And, towards the end of her direct examination, she was asked whether a trauma victim can turn these manifestations "off or turn it on at will." To this question she responded in part: "And most of the research now will show that, you know, it's a little bit like being cut. If you [are] cut, you bleed. If you go through a certain type of symptom, you're going to be traumatized. And it has nothing [to do] with . . . being tough or weak, it has to do with just what human beings do." In telling the jury that the signs of trauma are "a little bit like being cut. If you are cut, you bleed," Dr. Eversteine told the jury that the manifestations she had described usually, if not always, can be observed following a traumatic episode. Thus, the court's ruling resulted in no prejudice. I am confident that the outcome of the trial was not affected by the limitation that the court placed on Dr. Eversteine's testimony.

A petition for a rehearing was denied May 26, 2004. Pollak, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied August 11, 2004.

---

[3] It bears emphasis that the behavior to which Dr. Eversteine was referring was not the symptomatology of CSAAS but the manifestations of trauma.