Filed 11/24/15  P. v. Ruelas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C077651 |
| Plaintiff and Respondent, | (Super. Ct. No. SF124267A) |
| v. | |
| MIGUEL ANGEL RUELAS, | |
| Defendant and Appellant. | |

A jury found defendant Miguel Angel Ruelas guilty of one count of a sex crime with a child 10 years or younger (Pen. Code,[1] § 288.7, subd. (a)) and one count of continuous sexual abuse of a child (§ 288.5, subd. (a)).  On appeal, defendant contends that the trial court prejudicially erred by instructing the jury with CALCRIM No. 1193 relating to child sexual abuse accommodation syndrome.  We disagree and affirm.

---

[1]     Unless otherwise specified, all further statutory references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *Procedural History*

Defendant was tried twice on these charges. The first trial ended on March 20, 2014, with the trial court declaring a mistrial after determining the jury was unable to reach a verdict.

A second trial commenced on August 25, 2014. On September 10, 2014, the jury found defendant guilty of both counts. On October 27, 2014, the trial court sentenced defendant to 37 years to life. Defendant filed a timely notice of appeal.

### B

### *The Trial Evidence*

In or around 2002, V.M. began a relationship with defendant. At that time, M. had a son Ma. and a daughter M., who were around two years old. V.M. and defendant married in or around 2005 and their relationship ended in April 2008. During their relationship, V.M. gave birth to two children, Jasmine and Julian. From around June 2008 to May 7, 2013, Ma., M., Jasmine, and Julian stayed with defendant on the weekends.

At trial, M. identified defendant as her former stepfather and testified defendant "stuck his penis in [her] butt" when she was eight years old. She further testified defendant threatened to kill her if she told anybody about what had happened. M. also testified defendant put his penis in her butt on several other occasions when she was between the ages of 9 and 12. According to M., defendant continued to threaten to kill her if she told anybody about the abuse.

On May 7, 2013, M. approached a yard duty supervisor at her elementary school and told her she had been abused. Later that same day, M. met with one of the school's vice principals and told her she had been repeatedly molested by defendant. The vice principal subsequently contacted law enforcement officials.

On May 8, 2013, Detective Clarence Yates of the Stockton Police Department investigated M.'s allegations. As part of the investigation, Detective Yates arranged for M. to place a pretext phone call to defendant for the purpose of obtaining an admission, apology, and/or explanation from defendant. During a recorded call at 6:20 p.m. on May 8, 2013,[2] M. informed defendant she thought she was pregnant because she had missed her period after he had "put [his] thingy in [her] butt on Sunday." Defendant responded: "It can not happen that way . . . you're alright mama." In response to M.'s statement "you promised that you [wouldn't] do it again," defendant replied: "Yah, that's it. Done. Over. [¶] . . . [¶] Finished."

On May 13, 2013, Jeffrey Thompson, a physician's assistant, performed a nonacute forensic medical examination[3] on M. Thompson testified the purpose of the examination was to determine whether any signs or symptoms of sexual abuse were present, e.g., bruising, abrasions, scars, infection, swelling. Thompson found no physical signs suggesting any penetrating trauma to M.'s anogenital area, i.e., the area relating to M.'s anus and genitalia. Thompson, however, noted that such a finding is not uncommon given the timing between the most recent alleged sexual assault and the examination. According to Thompson, in a nonacute "setting," it is "not unusual and it's most likely" a person will have a normal physical exam, i.e., no physical findings of sexual assault. In his experience of performing over 2,000 forensic medical examinations, Thompson estimated he had only found evidence of trauma consistent with sexual assault during a nonacute forensic examination approximately 3 percent of the time. He testified the lack

---

[2] A digital recording of this conversation was played for the jury. A transcript of the recording was prepared by Detective Yates and admitted into evidence.

[3] A nonacute forensic sexual assault examination occurs more than 72 hours after an assault while an acute forensic sexual assault examination occurs within 72 hours of the assault.

of medical findings relating to penetrating trauma did not negate the fact anal penetration could have occurred. He stated the most important way to determine whether a sexual assault has occurred is "[u]sually the history provided by the victim." He further stated his medical findings are not inconsistent with someone reporting he or she had been sodomized over a period of time.

David Love, a licensed marriage and family therapist, testified as an expert for the prosecution regarding child sexual abuse accommodation syndrome.[4] Love testified child sexual abuse accommodation syndrome is a description of certain symptoms or signs common in child sexual assault victims. He explained the elements of the syndrome include secrecy; helplessness; entrapment and accommodation; delayed, conflicting or unconvincing disclosure; and retraction. He testified for someone to successfully molest a child, he or she go through a process called "grooming," which includes befriending the child, getting to know the child, and finding out whether he or she is in a position of power and control such that the child will not tell anyone about the molestation. According to Love, the strategies molesters use to control a child range from threat and fear to seduction. He further testified most children (94 percent) are sexually abused by a person they have a preexisting relationship with, and it is a myth

---

[4] During the prosecutor's direct examination of Love, defendant requested the court instruct the jury about the syndrome. The trial court granted defendant's request and instructed the jury with CALCRIM No. 1193 as follows: "You are hearing testimony from David Love regarding [the syndrome]. Mr. Love's testimony about [the syndrome] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not M.'s conduct was not inconsistent with the conduct of someone who has been molested[,] and [in] evaluating the believability of her testimony." The same instruction was given at the close of trial.

that sexually abused children will run away, yell, scream, or fight off the molester. He also testified children are often reluctant to report sexual abuse out of concern nobody will believe them. He explained children who are sexually abused experience overwhelming fears which immobilize them from taking action for their safety; they just try to survive and make the best out of the situation, including repeated contact with the molester and disassociation, i.e., mental detachment from reality. Finally, Love testified it is not uncommon for a victim to delay in disclosing sexual abuse and to have an inability to recall events, including the number of times the abuse has occurred. He also noted some victims will retract their allegations of sexual abuse for reasons unrelated to whether the abuse actually occurred.

On cross-examination, Love clarified that his testimony regarding the syndrome was not meant to be used as a formula or diagnostic tool to determine whether an individual child such as M. was telling the truth about being molested. Rather, he stated his testimony was meant to provide an overview of the "generic" things academics have taught about children who have been sexually abused. He explained the purpose of his testimony was to educate jurors about how sexually abused children act so the jurors could draw their own conclusions as to whether M. was telling the truth. For instance, he explained he did not want the jurors to conclude M. was not molested because it makes "no sense" that a child would delay in disclosing abuse. He also explained it would be improper for a juror to conclude a child such as M. was molested because one or more of the syndrome factors (e.g., delay in disclosure) were present. Love concluded his testimony by telling the jury he did not speak with M. prior to testifying and was not provided with any information about this case.

The defense called two witnesses at trial:  Ma. and defendant.  Ma. (M.'s brother) testified he never saw any inappropriate behavior between M. and defendant.  For his part, defendant testified he never put his penis in M.'s anus or touched her in a sexual way.  With respect to the pretext call, defendant testified the conversation was not clear and when he received the call he was getting high on drugs with a friend.  He further testified he thought M. was talking about her boyfriend when she told him she might be pregnant because "[y]ou put your thingy in my butt on Sunday."  According to defendant, he did not hear M. say the word "you."  Defendant also testified he thought M. was referring to the incident where he punched her in the face[5] when he told her:  "Yah, that's it.  Done.  Over.  [¶] . . . [¶]  Finished," in response to M.'s request for defendant to promise not to "do it again."

## DISCUSSION

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 1193 because the instruction improperly invites jurors to use expert testimony regarding the syndrome to evaluate the believability of a complaining witness.  According to defendant, CALCRIM No. 1193 is "erroneous" because it improperly "endorsed" the jury's use of Love's syndrome testimony to bolster M.'s credibility, thereby assisting the prosecution in proving the charges against him.  Defendant argues that by inviting the jury to find M. more credible based on the expert testimony, CALCRIM No. 1193 led the jury to convict defendant on a lesser showing than due process requires.  We disagree.

Numerous courts have found expert testimony concerning child sexual abuse accommodation syndrome properly admitted in sexual abuse cases.  (See, e.g., *People v.*

---

[5]     Defendant admitted to punching M. in the face a couple of weeks before she disclosed the abuse.  Defendant testified he punched M. out of anger after discovering she had used a cell phone to take pictures of herself in a bra and panties for her boyfriend.

6

*Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406-407.)  In *People v. McAlpin* (1991) 53 Cal.3d 1289, our Supreme Court explained that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.  [Citations.]  'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*Id.* at pp. 1300-1301, fn. omitted.)

Generally, absent a request by the defendant, a trial court has no sua sponte duty to give a limiting instruction.  (*People v. Smith* (2007) 40 Cal.4th 483, 516.)  However, in *People v. Housley* (1992) 6 Cal.App.4th 947, the appellate court concluded that because of the potential misuse of syndrome evidence and the potential for great prejudice to the defendant if such evidence is misused, trial courts have a sua sponte duty to instruct the jury on the use of evidence of the syndrome as follows:  "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true."  (*Id*. at pp. 958-959.)  The court reasoned it is appropriate to impose such a duty on trial courts because expert testimony regarding the syndrome "easily could be misconstrued by the jury as corroboration for the victim's claims"; noting "where the case boils down to the victim's word against the word of the accused, such evidence could unfairly tip the balance in favor of the prosecution."  (*Id.* at p. 958 [explaining that an instruction clearly defining the proper use of syndrome evidence will prevent the jury from accepting the expert's testimony as proof of the claimed molestation].)

Appellate courts independently determine whether a jury instruction correctly states the law. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767.) Review of the adequacy of an instruction is based on whether the trial court fully and fairly instructed on the applicable law. (*Ibid.*) When reviewing a purportedly erroneous instruction, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) In determining whether error has been committed in giving a jury instruction, courts must consider the instruction as a whole and assume that the jurors are intelligent persons and capable of understanding and correlating all the instructions which are given. (*Riley*, at p. 767.) A jury instruction should be interpreted, if possible, so as to support the judgment rather than defeat it if it is reasonably susceptible to such interpretation. (*Ibid*.)

Here, the jury was instructed with the standard version of CALCRIM No. 1193 as follows: "You are hearing testimony from David Love regarding [the syndrome]. [¶] Mr. Love's testimony about [the syndrome] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not M.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The trial court also instructed the jury on the reasonable doubt standard set forth in CALCRIM No. 220. Defendant did not object to CALCRIM No. 1193 in the trial court.[6]

The trial court did not err in instructing the jury with CALCRIM No. 1193. The instruction comports with *McAlpin* and *Housley*. Evidence regarding the syndrome is

---

[6] Generally, a party's failure to object to a jury instruction in the trial court results in a forfeiture of a challenge to the instruction on appeal. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) However, that rule does not apply when, as here, a party complains that the trial court gave "an instruction that is an incorrect statement of the law." (*Id.* at p. 1012.)

relevant and admissible in this case because defendant challenged the credibility of M.'s molestation claim. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745.) Further, CALCRIM No. 1193 properly instructed the jury on the appropriate use of such evidence. Contrary to defendant's contention, the instruction did not "endorse" the jury's use of such evidence to bolster M.'s credibility. The instruction did not explicitly state or imply that jurors may use evidence of the syndrome to corroborate M.'s molestation claim. Rather, consistent with *Housley*, the instruction expressly informed the jury that Love's testimony "*is not evidence that the defendant committed any of the crimes charged against him,*" and that they may consider the syndrome evidence *only* for the limited purpose of deciding whether M.'s behavior was not inconsistent with having been molested. (Italics added.) This is a correct statement of the law.

Love did not improperly render an opinion on M.'s credibility. (See *People v. Housley*, *supra*, 6 Cal.App.4th at p. 954.) He testified he had never met M. and was unfamiliar with the facts of this case. He also testified he was merely explaining behavior common to sexual abuse victims in general and was not offering an opinion on M.'s credibility.

Nor do we find the instruction improper because it allowed jurors to consider Love's testimony in evaluating the believability of M.'s testimony. M.'s credibility was a central issue in this case. M. delayed in reporting the abuse for a substantial period of time. At trial, defendant denied molesting M. and attacked her credibility by suggesting her behavior (i.e., delay in reporting the abuse) was inconsistent with her testimony claiming abuse. Defendant theorized M. fabricated her molestation claim because she was mad at defendant for punching her in the face. The People, therefore, were entitled to offer syndrome evidence as relevant to M.'s credibility. Expert testimony regarding the syndrome "is admissible to rehabilitate the complaining witness when the defendant impeaches her *credibility*." (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1300, italics

9

added; *see also People v. Patino*, *supra*, 26 Cal.App.4th at p. 1747; *People v. Housley*, *supra*, 6 Cal.App.4th at p. 956.)

DISPOSITION

The judgment is affirmed.

/s/
Robie, J.

We concur:

/s/

Blease, Acting P. J.

/s/
Nicholson, J.

10