Filed 12/18/24  P. v. Sampson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>TODD COLE SAMPSON, JR.,<br><br>  Defendant and Appellant. | A169375<br><br>(Solano County<br>Super. Ct. No. FCR343976) |

A jury convicted defendant Todd Sampson of felony counts of sodomy of a child under 10 years old and oral copulation of a child under 10 years old after he sexually abused his half brother (brother).  The trial court sentenced Sampson to 65 years to life in prison.  On appeal, his sole claim is that the court erred by admitting expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS).  We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.    Brother's Testimony*

Brother was born in spring 2010.  He and Sampson, who is 14 years older, have the same mother.  During the relevant time period, brother lived with his father during the week but spent weekends at his mother's Vacaville

home, where Sampson lived.  Brother and Sampson each had their own room at their mother's house.

Brother, who was 13 years old during the trial, testified that Sampson molested him "frequently" when he was in kindergarten and first grade. Sampson would come into his room, tell brother to take his clothes off, and then remove his own clothes.  Sampson would bend brother over and insert his penis into brother's "butt," which he did successfully "[m]ore than one time."  Sometimes, Sampson would put "lube or Vaseline" on his own penis "and try to get his penis farther into [brother's] butt."  Sampson would then "stop[] and go[] back into his room or . . . ejaculate[] on" brother's back or buttocks.  Afterward, brother took a shower or wiped himself off with a towel. It hurt when Sampson sodomized him, and he had blood in his "poop."

Brother also testified that Sampson sometimes put his penis in brother's mouth, which "hurt bad."  Usually, this happened on the same occasions when Sampson sodomized him.  Sampson sometimes ejaculated into brother's throat, and it "was like slime-ish and it taste[d] not good."  At the time, brother did not know what semen was, and Sampson told him it was "pee."

Brother did not tell anyone about the sexual abuse while it was happening because he "was scared."  Sampson used to "[b]eat [him] until [he] cried," and he thought Sampson would "hurt" him if he told.  On cross-examination, brother agreed that he did not like Sampson, who was often mean to him.

B.      *Brother's Disclosure and Forensic Interview*

When brother was eight years old, he told his paternal grandmother (grandmother) that Sampson was sexually abusing him.  Grandmother testified that brother had been having "really bad meltdowns" at home and

2

school.  She denied that he was "acting out sexually," but she did note that he asked her "what sex was about" and "what being gay meant."  She did not suspect that he was being sexually abused, "but something was obviously going on that . . . was hurting[,] and the behavior was very odd."

During one of brother's meltdowns at home, grandmother told brother she could not help him unless he trusted her and told her what was wrong.  Brother then said that Sampson "was going to play a game of hide-and-seek with him and that [Sampson] had peed in his mouth and that [Sampson] had gotten some lotion and tried to stick his wiener in [brother's] butt."  Grandmother testified that brother also told her "there was blood" when he went to the bathroom.  Brother had once seen a doctor when he was "making this really weird sound with his throat" and another time when "[h]e was peeing blood," but sexual assault was never suspected.

Grandmother decided to stop talking to brother about the sexual abuse because she thought he needed to speak to "a professional, because [she] wasn't a professional," and she scheduled a time for him to talk to a counselor.  Grandmother did not immediately report brother's disclosure because the situation was "uncomfortable," but she eventually contacted both Child Protective Services and the police.  Brother had no more contact with Sampson after telling grandmother about the abuse.

A retired Vacaville police detective assigned to the case testified that she learned of brother's allegations from Child Protective Services in November 2018, about a month after grandmother's report to that agency.  Soon afterward, another officer conducted a Multi-Disciplinary Interview of brother, a recording of which was played for the jury.

During the interview, brother said he was there to talk about "[t]he Todd problem."  He said Sampson came into his bedroom at their mother's

3

house and "tried to make [brother] suck his wiener. He tried to put his wiener up [brother's] butt. He tried to make [brother] kiss his butt. He tried to make [brother] suck his wiener . . . and . . . pee in [brother's] mouth." Brother said this happened when he was six or seven years old but stopped by the time he was eight.

Brother could not remember the first time the sexual abuse occurred, but when asked to describe the most recent time, he said Sampson "put gel on his wiener so it can go up [brother's] butt," but "it didn't work and [brother's] butt was bleeding also." Brother thought this had happened about five times. He described it as feeling "weirdish kind of on your butt" and "like a little pinch."

Brother also said Sampson always "peed in [brother's] mouth," including on the most recent occasion. Later in the interview, however, brother indicated that Sampson "peed in [brother's] mouth" only once but put his penis in brother's mouth twice. Brother said the "pee" tasted "weird," like "fuzz" or "poop and pee," and "[w]hen [brother] spit it out, it was white." Brother also thought Sampson "peed in [brother's] butt."

Toward the end of the interview, brother asked whether the interviewer was "gonna tell somebody" about what he had said. Brother then expressed fear of Sampson, wondering whether Sampson was "gonna come and kill" brother because brother "told." Brother indicated he waited to tell grandmother about the sexual abuse because he was scared that Sampson would kill him, although Sampson had never made such a threat.

C.    *Expert Testimony*

Blake Carmichael, Ph.D., a clinical psychologist, testified for the prosecution as an expert on CSAAS. He described CSAAS as "an educational tool" developed to address "myths and misconceptions that people held about

4

kids who had been sexually abused." He explained that CSAAS is "not like a mental health diagnosis" and cannot be used as a "test . . . to decide if a kid has been abused." He did not know anything about the facts of Sampson's case and would not offer an opinion about whether the child victim had been abused, which was up to the jury to decide.

As described by Dr. Carmichael, CSAAS has five components: secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recantation or retraction. These components explain behavior by sexually abused children that might otherwise seem inconsistent with their allegations, including not resisting abuse, not displaying strong emotions about it, failing to disclose it immediately, and being unable to describe it in detail. The components are not a "checklist of behaviors or relationships" that will be present every time a child is sexually abused.

Sampson's trial counsel cross-examined Dr. Carmichael about "the origin of CSAAS," which was initially developed over 40 years ago based on observations of a group of children who had been sexually abused. Counsel asked how the researchers confirmed the children had, in fact, been abused. Dr. Carmichael responded that he was not sure "exactly how they did their inclusion criteria," and the group most likely was not limited to children whose abusers were criminally convicted. Dr. Carmichael noted other ways to confirm a child has been abused, including medical findings and perpetrator confessions, and agreed there is "no set consensus how to verify" that abuse happened.

Bradley McAuliff, Ph.D., a psychology professor qualified as an expert in children's suggestibility and forensic interviewing, was the only witness for the defense. Dr. McAuliff testified that suggestibility refers to how a person's

memory is influenced, including by the person's age, outside influences, and the passage of time. Suggestibility is not lying, and people may give incorrect information without knowing their memory is "compromised."

Dr. McAuliff testified that children are generally more suggestible than adults are. When interviewing children, adults may ask questions that influence children without intending to coach them into a particular response. Repeated questioning can also affect children's responses, including by making them think they have not answered correctly or need to produce more information. The more time that has passed since an event, the more a witness's memory is "vulnerable to contamination from outside sources." Negative biases toward a person, such as if the person is disliked within a family, can also influence how a child describes that person's behavior.

Dr. McAuliff also testified that given such concerns, there are best practices for how to interview child witnesses. An interviewer should "get the child comfortable" and "basically put[] the child in the driver's seat" to "minimize the influence of the interviewer." An interviewer should also ask open-ended questions. Using these protocols is important "to elicit accurate information from children" and avoid false allegations.

D.     *The Verdicts and Sentencing*

Sampson was charged with three counts of sodomy of a child under 10 years old and two counts of oral copulation of a child under 10 years old, all occurring when brother was six or seven years old.[1] The jury convicted Sampson of all charges. The trial court sentenced him to a total term of 65 years to life in prison, composed of consecutive terms of 25 years to life for

---

[1] The charges were brought under Penal Code section 288.7, subdivisions (a) (sodomy) and (b) (oral copulation).

two of the sodomy convictions, a concurrent term of 25 years to life for the third sodomy conviction, a consecutive term of 15 years to life for one of the oral-copulation convictions, and a concurrent term of 15 years to life for the other oral-copulation conviction.

## II.
### DISCUSSION

Sampson claims the trial court prejudicially erred by admitting the CSAAS testimony. We are not persuaded.

### A.    *Additional Facts*

Before trial, the prosecution moved to admit CSAAS testimony by Dr. Carmichael. In response, Sampson filed a motion to exclude or limit such testimony. He argued that CSAAS evidence should be excluded because it is (1) not sufficiently reliable as scientific evidence under *Kelly/Frye*[2] and (2) confusing and time-consuming under Evidence Code[3] section 352.

At the hearing on the motions in limine, the trial court ruled that CSAAS testimony was "allowable" under governing case law to "explain to the jury . . . why kids act like they do when they're in that situation," but Dr. Carmichael could not testify about case-specific facts or "vouch for [brother's] veracity." The court did not specifically address Sampson's arguments under *Kelly* and section 352.

The trial court instructed the jury on CSAAS evidence under CALCRIM No. 1193, to which Sampson did not object. The instruction informed the jury that CSAAS "relates to a pattern of behavior that may be

---

[2] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. "[T]he rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

[3] All further statutory references are to the Evidence Code.

present in child sexual abuse cases. Testimony as to [CSAAS] is offered only to explain certain behavior of an alleged victim of child sexual abuse." The instruction also said that CSAAS testimony was "not evidence that [Sampson] committed any of the crimes charged" or any uncharged conduct, and the evidence could be considered only to evaluate brother's credibility and whether his "conduct was consistent with the conduct of someone who has been molested."

B.     *The Trial Court Did Not Err by Admitting the CSAAS Testimony.*

Sampson claims that CSAAS evidence is "inherently unreliable" because CSAAS is based on observations of children who were assumed, without legitimate verification, to have been sexually abused. He claims that the CSAAS testimony here therefore violated (1) section 801, which governs the admissibility of expert testimony; (2) section 352, which allows a trial court to exclude evidence based on its potential to confuse the issues and mislead the jury; and (3) the federal due process clause, which requires criminal trials to be fundamentally fair. These contentions fail.

Under section 801, an expert witness's "testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including [the expert witness's] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the witness's] testimony relates, unless an expert is precluded by law from using such matter as a basis for [an] opinion." Under section 352, a trial court has discretion to "exclude evidence if its probative

8

value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Finally, evidence violates a defendant's federal due process rights "only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*), italics omitted.)

We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Helzer* (2024) 15 Cal.5th 622, 667.) Whether the admission of evidence violated federal due process by making a trial fundamentally unfair is reviewed de novo. (*Partida*, *supra*, 37 Cal.4th at p. 437.)

As Sampson acknowledges, his position that CSAAS evidence is inherently unreliable and therefore inadmissible as a blanket matter is foreclosed by binding California Supreme Court precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In *People v. McAlpin* (1991) 53 Cal.3d 1289, the Supreme Court ruled that although expert testimony about CSAAS "is not admissible to prove that the complaining witness has in fact been sexually abused[,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with [the child's] testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id.* at pp. 1300–1301, fn. omitted.) In turn, California courts have held that when offered for this purpose, CSAAS expert testimony is sufficiently reliable to be admitted. (E.g., *People v. Ramirez* (2023) 98 Cal.App.5th 175, 214–216; *People v. Munch*

9

(2020) 52 Cal.App.5th 464, 472–473; *People v. Bowker* (1988) 203 Cal.App.3d 385, 390, 393–394.)

In light of this authority, the trial court did not abuse its discretion under state law by admitting the CSAAS testimony. We question whether Sampson preserved his section 801 claim, as he never argued below that the evidence was too unreliable under that statute. (See *Partida, supra,* 37 Cal.4th at pp. 433–434 [evidentiary objections must be timely and specific].) Sampson did object that the evidence should be excluded as unreliable under *Kelly/Frye*, but he sensibly abandons that claim on appeal: CSAAS testimony introduced for the approved purpose of correcting misapprehensions about how sexually abused children behave is not new scientific evidence subject to a *Kelly* analysis. (*People v. Munch, supra,* 52 Cal.App.5th at p. 472; cf. *People v. Wells* (2004) 118 Cal.App.4th 179, 188 [*Kelly* " 'precludes an expert from testifying based on . . . CSAAS . . . that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children' "].)

Assuming Sampson did not forfeit the section 801 claim, it nonetheless lacks merit because courts have uniformly held that CSAAS expert testimony is admissible for the limited purpose for which it was offered here. Notably, Sampson does not claim that Dr. Carmichael's testimony transgressed any limitations on CSAAS evidence under governing case law. And although Sampson questions whether jurors follow CALCRIM No. 1193's admonition that CSAAS evidence "is not evidence that the defendant committed any of the charged crimes," he does not contest that this instruction was also proper under governing law.

In turn, Sampson's claim under section 352 fails as well. Sampson cursorily argues that CSAAS evidence is inadmissible under that statute because, for the same reasons such evidence "is not reliable enough to be admissible as expert opinion testimony," it "poses an unreasonable danger of confusing the issues and misleading jurors." In other words, he offers no reasons for exclusion under section 352 beyond those he claims made the challenged evidence inadmissible under section 801. Because we already concluded the trial court properly admitted the CSAAS evidence under section 801, we likewise conclude the court did not err by declining to exclude it under section 352.

Finally, Sampson claims that "[s]ince CSAAS evidence is not reliable and poses an undue danger of confusing the issues and misleading jurors, its use is fundamentally unfair" in violation of the federal due process clause. "Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 174.) As *Lapenias* noted in rejecting a similar claim, "reviewing courts have routinely held the admission of CSAAS evidence does not violate due process." (*Ibid.*) Sampson gives us no reason to depart from such holdings here.

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P. J.

WE CONCUR:

_____

Banke, J.

_____

Langhorne Wilson, J.

*People v. Sampson*  A169375

12