Filed 3/13/13  P. v. Medrano-Melendez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B228904 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA343652) |
| v. | |
| CAMILO DANIEL MEDRANO-MELENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

In an amended information, the People charged defendant Camilo Daniel Medrano-Melendez with two counts of committing a lewd act on a child under the age of 14 years (Pen. Code,[1] § 288, subd. (a); counts 1 & 2), one count of continuous sexual abuse (§ 288.5, subd. (a); count 3) and one count of committing a lewd act on a child who was 14 or 15 years old, where the defendant was at least 10 years older than the victim (§ 288, subd. (c)(1); count 4). The alleged victim in count 1 was Evelyn L. The alleged victim in counts 2, 3 and 4 was M.D. As to all counts, it was alleged that defendant committed his crimes on multiple victims within the meaning of section 667.61, subdivision (b).

A jury found defendant not guilty on count 1, involving Evelyn, but found him guilty on counts 2, 3 and 4, involving M.D. Consequently, the jury found the multiple victims allegation (§ 667.61, subd. (c)) to be untrue. As to count 2, the jury found true the allegation pursuant to section 803, subdivision (f)(1), that the statute of limitations had been extended. As to counts 3 and 4 the jury found true the allegation pursuant to section 801.1, subdivision (a), that M.D. was under the age of 18 at the time of the offenses and the prosecution was commenced prior to her 28th birthday. The trial court sentenced defendant to state prison for a total of six years.[2] This appeal followed.

Defendant raises three contentions on appeal. First, he contends the trial court abused its discretion in permitting a forensic psychologist to testify regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) as a basis for explaining the victim's delay in reporting the abuse, and, notwithstanding the trial court's limiting instruction, its

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

[2] The court initially sentenced defendant to a total prison term of eight years and eight months, believing it was required to impose consecutive sentences. The court subsequently recalled this sentence and sentenced defendant anew to concurrent terms totaling six years.

admission created a substantial danger that the jury would consider CSAAS as supporting the claims of sexual abuse. Second, defendant contends the trial court improperly sanctioned defense counsel by excluding in its entirety the expert testimony of Dr. C. Paul Sinkhorn (Sinkhorn) due to counsel's failure to disclose to the prosecution the substance of Sinkhorn's testimony, and its ruling compromised defendant's constitutional rights to present a defense and due process. Finally, defendant contends the trial court abused its discretion in denying his motion to release juror identification information in order to investigate juror misconduct. We conclude there is no merit to defendant's contentions and affirm the judgment.

**FACTS**

Given the nature of the issues before us, and defendant's acquittal of the crime involving Evelyn L., we briefly detail the evidence supporting the judgment convicting him of the crimes against M.D.

M.D. was three days old when her mother died. Her father had difficulty raising her, so, when M.D. was two or three, he sent her to live with defendant and his family.

When M.D. was five or six years old, defendant began to touch her inappropriately. He touched her chest and vagina directly and through her clothing. This conduct continued from time to time. On one occasion, he asked her to give him a "blow job" and, with his hands on her head, guided her into position. When M.D. was nine, she returned to live with her father and two siblings across the street.

Eventually, M.D. visited with defendant and his family. During these visits, defendant resumed touching her breasts and vagina.

When M.D. was about 12, she, along with defendant's two daughters and their cousin who then was living in defendant's home, began taking algebra lessons from defendant. He taught the classes in the basement of his home. Occasionally, defendant called M.D. and asked her to come to class early before the others arrived. He would touch her breasts and vagina. In addition, he would rub his penis on her body, ask her to

3

give him a "blow job" or have sexual intercourse with her. Their last sexual encounter occurred just before M.D. turned 15.

In May 2004, right before her 15th birthday, M.D. was removed from her father's home and placed in foster care after reporting that her father had been forcing her to have sexual intercourse at least twice a week since the age of 11 or 12. Before being placed in foster care, M.D. told the social worker that she preferred to live with defendant and his family.

Although M.D. had opportunities to tell the social workers about defendant's sexual abuse, she chose not to. She wanted to spare defendant's wife and daughters any embarrassment.

Upon her release from foster care in October or November 2004, M.D. moved to Arizona to live with her brothers. While in Arizona, she maintained contact with defendant and his family, via telephone and letters.

In February 2008, M.D. was still living in Arizona and about to graduate from high school when she received an unexpected telephone call from Los Angeles Police Detective Leslie Mariscal. The detective informed M.D. that the mother of a girl had called the police about defendant and stated that another girl, who had been raised by defendant and his family, might also be a victim. At this point, M.D. related her own experiences with defendant to the detective.

M.D. explained that she had not told anyone about defendant's conduct, not even the police officers who years earlier had interviewed her about her father's sexual abuse. She did not want defendant's wife or daughters to find out for fear of being rejected by them.

It was stipulated that on May 19, 2004, a sexual assault examination was performed on M.D. A DNA profile matched M.D.'s father, not defendant. The nurse who examined M.D. noted that M.D. had a worn away hymen, which is a sign of chronic sexual intercourse.

4

## DISCUSSION

**A.  *Expert Testimony Regarding CSAAS***

### 1.  Standard of Review

We review the trial court's decision to admit expert testimony under the abuse of discretion standard.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; *People v. Bradley* (2012) 208 Cal.App.4th 64, 84.)

### 2.  CSAAS

The theory of CSAAS was first delineated by Roland Summit.  (Summit, *The Child Sexual Abuse Accommodation Syndrome* (1983) 7 Int'l J. of Child Abuse & Neglect 177; see also Comment, *The Admissibility of "Child Sexual Abuse Accommodation Syndrome" in California Criminal Courts* (1986) 17 Pacific L.J. 1361.) "The syndrome assumes the child is a 'legitimate victim' of sexual abuse; its purpose is to explain why such victims exhibit certain types of behavior so as to assist psychology professionals in providing therapy and treatment."  (*People v. Bowker* (1988) 203 Cal.App.3d 385, 392, fn. 8, citing Summit, *The Child Sexual Abuse Accommodation Syndrome*, *supra*, at pp. 179-180.)

It is well established that expert testimony regarding CSAAS is inadmissible to prove that a defendant sexually abused a child and thus committed the sex crimes with which he is charged.  (*People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino (*1994) 26 Cal.App.4th 1737, 1744.) However, expert testimony about CSAAS is admissible for the very limited purpose "'of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation.' [Citations.]" (*People v. Wells*, *supra*, at p. 188; accord, *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *People v. Patino*, *supra*, at p. 1744; *People v. Bowker*, *supra*, 203 Cal.App.3d at p. 392.)  Stated otherwise, "CSAAS testimony 'is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is

inconsistent with his or her testimony claiming molestation. [Citations.]'" (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001, quoting *People v. McAlpin*, *supra*, at pp. 1300-1301.) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" *People v. McAlpin*, *supra*, at p. 1301.) CSAAS "evidence must be tailored to address the specific myth or misconception suggested by the evidence." (*People v. Wells*, *supra*, at p. 188, citing *People v. Bowker*, *supra*, at pp. 393-394.)

### 3.  Relevant Facts and Analysis

Prior to trial in this case, the People filed a motion pursuant to Evidence Code section 402, seeking to admit testimony regarding CSAAS. The People sought to offer the testimony of Eisen to explain CSAAS. The People anticipated that the defense would attack the credibility of the victims by "rely[ing] upon common misconceptions associated with the victim's conflicting statements and delayed disclosure." In the People's view, the expert's proffered testimony was necessary "to support the victim's credibility and to rebut the inferences raised by the defense at trial in this matter." Defendant filed written opposition to the motion, arguing, among other things, that the proffered testimony was inadmissible pursuant to Evidence Code section 352. Defendant further argued that if the court admitted the evidence, it had to restrict the evidence and give the jury a limiting instruction.

Following an Evidence Code section 402 hearing, the court ruled: "I will allow the expert to testify on secrecy, helplessness and delay, but I expect his testimony to be very brief and directly to the point. And of course, I will give [an] appropriate limiting instruction. I'm not very comfortable with this . . . . but I am going to allow it because I see other cases have allowed it and I think that it is of some possible value. But if I feel it's being abused, I will certainly step in. So over objection, that is the court's ruling."

While Eisen testified, the trial court took painstaking care to ensure that his testimony stayed within the perimeters of its ruling. Eisen explained that CSAAS is a

theory or model that sheds light on why child victims of sexual abuse delay in reporting the abuse. Despite its name, CSAAS is not a syndrome at all. Nor is it a diagnostic tool or "a science concept per say." Rather is it a "simple clinical theory about why many kids don't tell about their abuse experiences right away."

When the prosecutor asked Eisen to explain the key elements of the model, the trial court interjected: "That's too broad. I've limited Dr. Eisen's testimony, Ladies and Gentlemen, and he's here principally to talk about what the research has shown regarding whether or not persons or children claiming to have been victims of m[olestation] immediately report, or is it common that they do not. And that's really what we're focusing this testimony on."

Upon inquiry by the trial court, Eisen acknowledged that he had not interviewed anyone about the claims in this case and he was only in court to testify that there may be a commonly held misconception about the behavior of victims of abuse. At that juncture, the court addressed the jury: "And, Ladies and Gentlemen, you are not to consider this evidence from this witness as evidence that any of the claims of the victim, the alleged victims in this case are, in fact, true. His testimony is very limited only to this idea that to the common person it might be thought that well, if somebody has something bad happen to them they immediately report it, and he's here to say, well, the research shows otherwise and I think we're going to have a few more questions and that's going to be it. I'll give you a more limiting instruction at the appropriate time, but this is what is called a limiting instruction as to what he is saying and you must not rely on his testimony to determine if the claims of the alleged victims in this case are true or not. That is a jury question and you are the jury and I'm not allowing him to opine on that."

Thereafter, Eisen testified that one of the key elements of CSAAS is delayed disclosure by the victim. He explained that "all abuse happens in secrecy and children feel helpless in the face of adult authority because they're in charge." Participation in the activity with the adult, shame and self-blame are common reasons children might not disclose the sexual abuse.

7

On the other hand, Eisen noted that some children do report the abuse right away. He explained that "[e]verybody differs in this regard. Everybody is different and all the circumstances are different, but I think what everyone accepts, and I can safely say there's general acceptance on folks on all sides of this issue, is that retrospective studies with adults tell us that most folks who report having experiences, sexualized experiences with adults when they're children do not tell when they're children and really kind of keep it to themselves over time."

Eisen explained that CSAAS is not a predictor of whether sexual abuse actually occurred and that a delay in reporting sexual abuse is not an indicator that there was abuse. He emphasized that the individual who created the model did not use it as a diagnostic tool to determine if sexual abuse occurred. Rather, his model was derived from his observations in "actual cases" of child sexual abuse that children delayed in reporting the abuse for a variety of reasons.

Immediately after Eisen completed his testimony, the court instructed the jury as follows: "Ladies and Gentlemen, you have heard testimony from Dr. Mitchell Eisen regarding Child Sexual Abuse Accommodation Syndrome. Dr. Eisen's testimony about the Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Evelyn L. and [M.]D.'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of those witness' testimony."[3]

M.D. testified defendant began molesting her sexually when she was around five years old. The abuse continued until she was eight or nine when she returned to live with her father. The abuse resumed in middle school when defendant was tutoring.

M.D. never intended to report the abuse. When police contacted her in February 2008 and told her that defendant had molested another girl, M.D. revealed that defendant

---

[3]     This instruction on CSAAS is set forth in CALCRIM No. 1193.

had molested her as well. She had been afraid to report the abuse, believing it would destroy her relationship with defendant's wife and daughters, whom she considered as her mother and sisters, respectively.

Given M.D.'s substantial delay in reporting the sexual abuse at the hands of defendant, and in reasonable anticipation that defendant would attack M.D.'s credibility as a result, the trial court acted well within its discretion in allowing Eisen to give limited testimony about CSAAS in order to help the jury understand alternative explanations for M.D.'s delayed reporting of the sexual abuse. (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 45; *People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301; *People v. Sandoval*, *supra*, 164 Cal.App.4th at pp. 1001-1002.) And the trial court diligently ensured that the "evidence [was] tailored to address the specific myth or misconception suggested by the evidence." (*People v. Wells*, *supra*, 118 Cal.App.4th at p. 188, citing *People v. Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.)

### 4. Instructional Challenge

In accordance with CALCRIM No. 1193, the trial court instructed the jury as follows: "You have heard testimony from Dr. Mitchell Eisen regarding child sexual abuse accommodation syndrome. Dr. Eisen's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Evelyn L.'s and [M.]D.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." This is the same instruction, the trial court gave the jury right after Eisen completed his testimony.

Defendant contends that this instruction "told the [jurors] that they *could* indeed base their verdict on the very assumptions inherent in CSAAS — that [M.D.]'s behavior in not reporting [defendant's] abuse until more than 4 years after the last act was 'not inconsistent with the conduct of someone who has been molested' and could also serve to support her testimonial credibility." We disagree.

9

CALCRIM No. 1193 correctly told the jury that it was not to consider Eisen's testimony about CSAAS as evidence that defendant committed the crime against the alleged victims. The instruction did not tell the jury to believe Evelyn or M.D. if their conduct was consistent with the CSAAS. Instead it cautioned the jury not to disbelieve the witnesses simply just because they did not report the abuse when it happened. Thus, the instruction served to ensure that the jury would consider the evidence regarding CSAAS only to evaluate Evelyn's or M.D.'s credibility. We perceive no misdirection in this instruction.

## B. *Discovery Sanctions*

### 1. Relevant Facts

In correspondence dated September 30, 2009, the defense provided the prosecutor with a list of witnesses it "reasonably intend[ed] to call at trial." Among the individuals listed was Sinkhorn. Defense counsel specified that "[n]o report from Dr. Sinkhorn is anticipated, but will be provided to you if and when received by us."

During a recess taken while the prosecutor was examining her last witness, she advised the trial court that defense counsel had yet to disclose the substance of Sinkhorn's testimony. The prosecutor stated that Sinkhorn was on the defense's witness list and that defense counsel indicated that he would let her know once she rested. Defense counsel stated that he told the prosecutor "that I wouldn't mention him by name. I wouldn't mention what he was going to testify by name. I would tell her immediately upon her resting. And if the court decides that it's inappropriate at that time and it's not proper impeachment, okay. But for strategic work product reasons, I don't want to disclose at this point."

After the prosecutor rested her case, the trial court inquired if defense counsel was going to call Sinkhorn to testify. Defense counsel answered in the affirmative, after which the following transpired:

"THE COURT: And what's he going to testify to?

"[DEFENSE COUNSEL]: He's going to testify that were a nine-year-old girl to be raped for five to ten minutes in the manner that Evelyn described herself as having been raped,[4] that there would be even to this day demonstrable evidence, physical evidence which would be displayed by a medical exam confirming the existence of that rape. And given the People's failure to provide any such evidence, the natural conclusion is that none exists albeit; therefore, no such rape occurred. He is certainly not going to argue — he's just going to say that in a case like this where a girl nine, who is raped in the fashion she says she was raped, for the period of time she said she was raped, experiencing pain which would indicate a breaking of the hymen, that would mean that there would be tissue scarring and that — and that any gynecological examination today would show.

"THE COURT: He has not examined her; is that correct?

"[DEFENSE COUNSEL]: He has not and he's not going to say that he has. The argument is that the People didn't put on such any evidence. And I'm, again going to rely on a jury instruction that says if you conclude — the one that says you can take from the absence of evidence — you know which one I'm talking about, your Honor.

"THE COURT: Sure, the circumstantial evidence instruction.

"[DEFENSE COUNSEL]: Well, there's the one that specifically says — and I'm drawing a blank right now, but the gist of it is if such evidence — you can assume by the absence — you can conclude that if they failed to put on better evidence, something like that — I have to look at the instructions."

The court then inquired whether the People had an objection, and the prosecutor answered in the affirmative. The prosecutor argued that the proffered evidence was untimely, was not impeachment evidence and should have been disclosed earlier. The

---

**4**     Evelyn testified that defendant raped her when she was between seven and nine and that the rape lasted about five minutes. It was not until she was 16 years old that she told a doctor about the rape during a medical examination. After talking to the police, Evelyn told her mother what had happened.

11

court sustained the objection, stating: "This is not what is anticipated by *Izazaga*[ *v. Superior Court* (1991) 54 Cal.3d 356] as to material that can be withheld for the purpose of cross-examining a witness and that's my position. So I'm not going to allow him to testify. I think it's unfair surprise, . . . ." The following colloquy then took place:

"[DEFENSE COUNSEL]: Well, your Honor, just so I may?

"THE COURT: Sure.

"[DEFENSE COUNSEL]: The fact of the matter is that dollars for donuts if the prosecution had that evidence, they'd put it on. I'm not required to —

"THE COURT: You can argue, there's no physical evidence in the case. That's certainly permissible. Ladies and gentlemen — this is the argument I think you're going to be giving is, Ladies and Gentlemen, you can't believe this witness. You can't believe this evidence. Where is the D.N.A. linking my client? Where is the physical evidence? There's nothing. We're told that Evelyn went to the doctor. We don't know anything about what that doctor found. There's no evidence of anything that shows that she was penetrated in any way. I think that's your argument. But for you to call a medical doctor now and have him say, well, you know, I am impeaching her testimony because I'm giving a medical opinion as to what her physical condition would be, I think it's unfair to the People. You had an obligation to have given it to the People.

"[DEFENSE COUNSEL]: Just so the record is clear, and the reason I didn't is because of the testimony that she went to a medical doctor. Okay. So the point being that they introduced as their case in chief that she saw a doctor, thereby lending the inference that she was examined in connection with this rape. At that point I'm entitled to bring in impeaching evidence of what — what such examination should have shown without prior disclosure.

"THE COURT: I don't consider this impeaching evidence and you've got your record.

"[DEFENSE COUNSEL]: Fair enough.

"THE COURT: You've got your objection. I just don't think so. I think you had to give notice. So I'm declaring failure of discovery."

12

The following day, defense counsel filed a brief in support of his request to permit Dr. Sinkhorn to testify. After both sides addressed the trial court, it ruled as follows: "All right. I've heard the argument. I stand by my decision. Now, first of all, I think your argument today makes little sense to me. I don't think there's anything on the basis of this record that suggests that because [M.D.] has a worn hymen that that points at your client. The D.N.A, evidence supports the fact that her own father was sexually assaulting her. She testified to that fact — to that effect. If anything, the fact that the People are stipulating that there is physical evidence of a worn hymen invites the argument from you, and I would allow this argument, is where is the evidence that Evelyn had a worn hymen. There is no medical evidence in this case. What I find so unfortunate here is that I do think this was clear out-and-out surprise and an attempt to surprise the prosecution for the very reason that the People have said."

The court thereafter added: "And I can tell you that even if you didn't have a report from Sinkhorn, in the court's view you were required to tell the People what you were calling him for. And as you said yesterday, you were calling him to say that there should be some type of physical evidence on Evelyn and the fact that the People did not put any physical evidence in suggests that Evelyn is stretching the truth or is not being truthful with the jury. And frankly, many of these arguments can still be made in light of the fact that there is evidence, according to the stipulation that will be entered into, that [M.D.] had a worn hymen. So I don't feel I'm really hamstringing the defense. I am viewing this as an attempt to ambush the People and an attempt to preclude them from calling the doctor who saw Evelyn years ago. Who knows what that doctor would say, but we're entering into an area where the People cannot respond effectively when you spring it on . . . at the last minute. And I do not consider this to be impeachment. So that's the court's ruling. In terms of a lesser sanction, I don't see one that's possible because the only way to rebut what Dr. Sinkhorn would say about Evelyn would be to call Evelyn's doctor and have the doctor say, well, according to my notes, and I mean, who knows if the notes are destroyed. I don't know. You can argue . . . to the jury there is no medical evidence to support that Evelyn was penetrated." "And there is medical

13

evidence to show [M.D.] was and we know who penetrated [M.D.], you've got the D.N.A. You've got your argument, but . . . I'm not going to let you call Sinkhorn because I feel that you did ambush the People and I think you were under an obligation to produce it."

### 2. Analysis

On June 5, 1990, California voters adopted Proposition 115, the Crime Victims Justice Reform Act. This proposition was a "broad anticrime initiative measure" that, among other things, added to the Penal Code statutory provisions establishing "a new scheme of reciprocal discovery in criminal cases." (*Galindo v. Superior Court* (2010) 50 Cal.4th 1, 10; accord, *Clinton K. v. Superior Court* (1995) 37 Cal.App.4th 1244, 1248.) Before the adoption of Proposition 115 and the enactment of the statutory criminal discovery provisions (§ 1054 et seq.), criminal discovery primarily was governed by case law. (*Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1242.)

Section 1054.3 provides: "(a) The defendant and his or her attorney shall disclose to the prosecuting attorney: [¶] (1) The names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons, including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial. [¶] (2) Any real evidence which the defendant intends to offer in evidence at the trial."

Whether defendant was required to disclose the substance of Sinkhorn's testimony prior to trial pursuant to section 1054.3, whether Sinkhorn's proposed testimony amounted to impeachment evidence, whether impeachment evidence is subject to discovery and whether the trial court abused its discretion in precluding Sinkhorn from testifying as a discovery sanction are questions we need not decide. Reversal of the judgment is only required if the erroneous exclusion of evidence is prejudicial, resulting in a miscarriage of justice. (Evid. Code, § 354; Cal Const., art. 6, § 13; *People v. Watson*

14

(1956) 46 Cal.2d 818, 836; *People v. Memory* (2010) 182 Cal.App.4th 835, 862.) It is a miscarriage of justice if a result more favorable to defendant would have been attained in the absence of error. (*Watson*, *supra*, at p. 836.) Inasmuch as the jury found defendant not guilty of count 1, he cannot demonstrate that the exclusion of Sinkhorn's testimony, if error, was prejudicial insofar as the only count involving Evelyn L. was concerned.

As to the remaining counts involving M.D., the parties stipulated that during a sexual assault examination performed in May 2004, the nurse discovered that M.D. had a worn away hymen, a sign of chronic sexual intercourse. In addition, the DNA profile matched M.D.'s father, not defendant. Since none of this evidence in anyway implicated defendant, to the extent defendant argued that Sinkhorn would have testified it was impossible to say with a degree of medical certainty which of two males caused M.D.'s worn hymen, such testimony would not have aided in the determination whether defendant molested M.D. We therefore reject in its entirety defendant's contention that the trial court improperly sanctioned defense counsel and violated his constitutional rights to present a defense and due process by precluding Sinkhorn from testifying.

## C. *Motion for Release of Juror Identification Information*

### 1. Relevant Proceedings

At the March 3, 2010 probation and sentencing hearing, defense counsel informed the trial court that an investigation into possible juror misconduct was underway. The trial court granted the defense's request for a continuance in order to prepare a motion for new trial.

On May 13, 2010, defendant petitioned the court for an order disclosing juror information pursuant to Code of Civil Procedure section 237, claiming the information was necessary to prepare a motion for new trial based, in part, upon jury misconduct. The trial court denied the motion, concluding that counsel's own declaration was insufficient to establish a prima facie showing of good cause for release of the requested information. The court continued the matter to allow defense counsel to renew the motion.

15

On June 11, 2010, defendant filed an amended petition seeking disclosure of juror information. This time, the motion was supported by the declaration of Juror No. 7.

At the hearing on this renewed motion, the trial court noted that Juror No. 7's declaration contained 14 numbered paragraphs, the first two of which were foundational in nature. With respect to paragraphs 3 through 12,[5] the court found them "clearly

---

[5]     Therein Juror No. 7 declared:

"3. I did not believe that [M.]D.'s [*sic*] testified truthfully. I do not believe today that [M.D.] testified truthfully. I know that other jurors did not believe [M.D.] testified truthfully because during deliberations they so stated.

"4. Although I believe I understood most of the instructions that were provided to the jury, I was confused by some of the wording contained therein. I know that other jurors were also confused by the jury instructions because during deliberations they so stated. Specifically, I was confused by the jury instruction pertaining to Counts 2, 3, and 4 regarding [M.D.]

"5. But for the wording of the jury instructions, I would not have voted to convict the Defendant. Furthermore, based on what was said during deliberations, I do not believe several other jurors would have voted guilty but for the wording of the jury instructions.

"6. When deliberations began, the jury was split approximately in half as to the charges relating to [M.D]. Most of the female jurors (with the exception of one or two) believed that [M.D.] was telling the truth and voted to convict the Defendant. Most of the men, however, did not believe [M.D.]'s testimony, thought she was lying, and initially voted 'not guilty'. Several jurors were undecided.

"7. After repeated votes without any change in the voting, we referred to the jury instructions.

"8. I and other jurors did not believe the Defendant raped or otherwise had sex with [M.D.] at any time, and to this day I still hold this belief.

"9. Specifically, the jurors (myself included) who previously voted to acquit the Defendant were confused by the instruction pertaining to Counts 2, 3, and 4, in that it lead [*sic*] us to believe that if there was any possibility that Defendant touched [M.D.] on any part of her body at any time, he was guilty of the crime alleged in Counts 2, 3, and 4.

"10. Accordingly, I answered yes to the question of whether the Defendant 'willfully touched any part' of [M.D.]'s body because I believed it was possible the Defendant did touch her.

"11. Once we reached the conclusion that it was possible that the Defendant may have touched [M.D.] on some part of her body, we found that it must have been for sexual gratification because (of the jurors who initially voted not guilty) we collectively believed there would be no other reason for him to do so. Accordingly, I answered yes to

16

insufficient to show good cause because they contain hearsay statements and evidence of the juror's subjective reasoning processes which by law would be incompetent to impeach the verdict pursuant to Evidence Code section 1150." After stating that there was nothing in the first 12 paragraphs that would cause it to commence the process entailed in releasing juror information, the trial court turned to paragraphs 13 and 14 in which Juror No. 7 stated:

"13. Furthermore, I know that at least one of the jurors slept through at least 25% of the trial because I saw her sleeping, and because the juror admitted having been asleep. Other jurors told me they saw her sleeping as well.

"14. Also, I know that one of the jurors did not speak sufficient English to adequately understand or communicate, which prevented her from participating in deliberations, because it was discussed during deliberations and because it was apparent to me by her words and conduct. Significantly, this juror stated during voir dire that she did not speak English well and believed it would prevent her from performing her duties as a juror."

With regard to paragraph 13, the trial court stated, "I can tell you I presided at this trial. One of my jobs is to watch the jurors. In a recent trial I excused a juror for sleeping. I did not see anyone in this short trial sleeping and I take exception to the juror's allegation. I think I do not place a great deal of weight on it based on my own observation of the trial."

As for paragraph 14, the court observed, "That leaves me with paragraph number 14, that one of the jurors did not speak sufficient English to adequately understand or communicate. Now, that's — again, that's a conclusion by this Juror Number 7 who is unhappy with the verdict for some reason after having agreed that the

the question whether the Defendant 'committed the act with the intent of arousing, appealing to, or gratifying [his] lust, passions, or sexual desires'.

"12. I further believed that if I answered yes to the foregoing, that I had to answer yes to the question of whether this amounted to 'substantial sexual conduct or lewd and lascivious conduct', and therefore voted guilty on counts 2, 3, and 4."

17

verdict was his verdict, having been polled in open court. Each juror participated in voir dire. Each juror provided in open court in front of others in English that juror's residence, marital status, occupation, occupation of spouse, if the juror had prior jury service, the juror's education, and whether the juror belonged to any politically affiliated organization. And in addition, as []is my custom in cases such as this, I ask how many children the jurors had and the age and sex of the children, and I believe I did in this case. My notes show in the jury selection, in addition I asked each juror, giving each juror a microphone, to respond that if the juror had ever known anyone who was a victim of child molestation or accused of child molestation. In short, it is my observation that in questioning the jurors, that the jurors who ended up on this panel or on this jury spoke sufficient English to respond to all of these questions.

"I've been doing this a long time and it is often the case in jury selection that jurors will assert that they don't speak good English for one reason or another, and I have frequently excused from panels jurors that I believe did not have a sufficient command of the English language to fulfill their obligations as jurors. I did not have that concern about any of the jurors in this case. Again, I watched carefully as the jurors responded in open court to voir dire. And frankly, I felt there was a sufficient understanding of the English language evidence by all jurors who ended up on the case and I'm not accepting of this Juror Number 7's statements that his opinion now, well after the fact, that one of the jurors did not understand sufficient English to participate meaningfully and the jury instructions has any bearing in fact. I just am very doubtful of that, and I'm very concerned of this kind of allegation that comes forward well after the fact. So I therefore reject based on my own observation that these last two points made by the juror."

The court further noted that "this is kind of a grasping-at-straws effort by the defense to find error in a case that was a very simple, straightforward case. The jury was presented with the testimony of two alleged victims. The jury rejected the testimony of one of the alleged victims and believed [M.]D. This court found [M.]D. to be an extremely believable witness, despite the evidence of the defense to impeach her for

18

possible bias. There just wasn't any showing of meaningful bias that the court could see, and I think the jury felt the same way."

Commenting further, the court stated: "I've given counsel I think more than adequate time to bring this motion. This is the second attempt by the defense in this case to obtain juror identifying information. This defendant was convicted back in February of 2010. My records show the conviction was returned on February 10th. Here it is, we're near the end of July and the only allegation that I think has any merit is — the only allegations that have any merit for consideration are that, well, gee, maybe one of the jurors was sleeping and one of the jurors didn't speak good enough English, and I reject both of those frankly. I was here. I saw the trial. I thought the defendant got a fair trial. It was a very short trial. It was a question of who are you going to believe, and frankly, the prosecution produced in my view a very believable witness. So that's where I come out with this. That's the record."

## 2. Applicable Law

After a criminal jury verdict is recorded, all identifying juror information is sealed until further order of the trial court. (Code Civ. Proc., § 237, subd. (a)(2).) Code of Civil Procedure section 206, subdivision (g), permits a defendant to petition the trial court, pursuant to Code of Civil Procedure section 237, for access to personal juror identification information—i.e., jurors' names, addresses, and telephone numbers—upon a showing that such information is necessary for a new trial motion or any other lawful purpose. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087.) A motion for disclosure of juror information must be "supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information . . . ." (Code Civ. Proc., § 237, subd. (b).)

The trial court's decision to deny a petition for an order disclosing juror information pursuant to Code of Civil Procedure section 237 "is reviewed under the

19

deferential abuse of discretion standard." (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; accord, *People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

### 3. Analysis

Defendant contends the trial court abused its discretion in refusing to release juror identification information so that he could investigate juror misconduct. On appeal, he only relies on the grounds set forth in paragraphs 13 and 14 of Juror No. 7's declaration to support this contention.

With regard to Juror No. 7's claim that a juror was asleep for one-quarter of the trial, the trial court rejected that assertion, noting that it had watched the jury and did not notice any juror sleeping. The court's disbelief of Juror No. 7 based upon its own personal observations was more than a sufficient basis for rejecting this ground for defendant's motion for disclosure of the jurors' personal identifying information. (*People v. Carrasco*, *supra*, 163 Cal.App.4th at p. 991; *People v. Santos*, *supra*, 147 Cal.App.4th at p. 978.)

With regard to Juror No. 7's claim that one juror did not understand English sufficiently, the record discloses that during voir dire Prospective Juror No. 41 said she was having trouble understanding. The court thereafter asked if anyone else was having trouble understanding English. When Prospective Juror No. 32 indicated she was having trouble, the following colloquy transpired:

"THE COURT: How long have you lived in the United States?

"PROSPECTIVE JUROR NO. 32: 12 years.

"THE COURT: And what do you do for a living?

"PROSPECTIVE JUROR NO. 32: I'm not doing anything. I — I — I just a housewife.

"THE COURT: Well, your English sounds terrific.

"PROSPECTIVE JUROR NO. 32: But I don't think I fully understand, you know, sometimes the names.

"THE COURT:  Let me tell you — well, Juror Number 32, your English is so good, I'm going to hold on to you.  Let me tell you that sometimes — sometimes people come to court and they're concerned about their ability to understand, and let me explain: it's up to the attorneys to explain the case to you.  Don't be afraid that they might be using big words that you don't understand because if they do, it's on them, it's their problem.  The job of an attorney, in part, is to help the jurors understand what the case is about and what the evidence is, and don't — don't be concerned in that regard."

Noting it was "more concerned" about Prospective Juror No. 41, the trial court excused her.  Upon inquiry, neither the prosecutor nor defense counsel had any objection.  They also voiced no concerns about Prospective Juror No. 32, who had no problem understanding or answering questions posed during further voir dire, who had served on a prior jury, and who ultimately was seated as Juror No. 10.  Neither the prosecutor nor defense counsel challenged Prospective Juror No. 32 for cause, and they did not exercise a peremptory challenge against her despite having additional peremptory challenges to exercise.

Under these circumstances, we conclude that the declaration of Juror No. 7 did not establish juror misconduct justifying a hearing under Code of Civil Procedure section 237.  Defendant has failed to demonstrate that the trial court abused its discretion in denying his motion for an order disclosing juror information.  (*People v. Carrasco*, *supra*, 163 Cal.App.4th at p. 991; *People v. Santos*, *supra*, 147 Cal.App.4th at p. 978.)

## DISPOSITION

The judgment is affirmed.

JACKSON, J.

We concur:

PERLUSS, P. J.

ZELON, J.