Filed 3/25/21  P. v. Fontanilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY FLOYD FONTANILLA,<br><br>Defendant and Appellant. | F077227<br><br>(Super. Ct. No. F16906751)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Jeffrey Floyd Fontanilla was accused of physically and sexually abusing his stepsons, J. and M., between 2006 and 2013.

A jury found defendant guilty of forcible lewd acts upon a child by forcing M. to touch defendant's penis the first time (Pen. Code, § 288, subd. (b)(1);[1] count 2); attempted forcible lewd acts upon a child by attempting to force M. to touch defendant's penis the second time (§§ 288, subd. (b)(1), 664; count 3); forcible lewd acts upon a child by forcing M. to digitally penetrate defendant's adult sister Ja.[2] (§ 288, subd. (b)(1); count 6); and sodomy of J., a child 10 years of age or younger, the first time (§ 288.7, subd. (a); count 10).[3] Defendant was sentenced to an aggregate prison term of 25 years to life, plus six years, eight months.

On appeal, defendant contends his conviction and sentence on count 10 violate the ex post facto clauses of the United States and California Constitutions because the evidence permitted an inference the offense may have occurred prior to September 20, 2006, the effective date of section 288.7. He additionally contends he was denied a fair trial due to improper statistical testimony given by the prosecution's expert witness.

We agree with defendant that his conviction and sentence on count 10 must be reversed on ex post facto grounds. We accept the People's concession that some of the expert's testimony was improper, but conclude the testimony was harmless.

In light of the reversal on count 10, we will remand for resentencing on the remaining counts. In all other respects, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3] The disposition of the remaining counts is explained in detail below.

# PROCEDURAL HISTORY

Defendant was charged in a first amended information with sodomy of M., a child 10 years of age or younger (§ 288.7, subd. (a); count 1); forcible lewd acts upon a child by forcing M. to touch his penis the first time (§ 288, subd. (b)(1); count 2); forcible lewd acts upon a child by forcing M. to touch his penis the second time (§ 288, subd. (b)(1); count 3); forcible lewd acts upon a child by forcing Ja. to touch M.'s penis (§ 288, subd. (b)(1); count 4); forcible lewd acts upon a child by forcing Ja. to orally copulate M. (§ 288, subd. (b)(1); count 5); forcible lewd acts upon a child by forcing M. to digitally penetrate Ja. (§ 288, subd. (b)(1); count 6); forcible lewd acts upon a child by penetrating M.'s anus with the " 'pink thing' " (§ 288, subd. (b)(1); count 7); forcible lewd acts upon a child by forcing M. to penetrate defendant's anus with the " 'pink thing' " (§ 288, subd. (b)(1); count 8); child abuse of M. (§ 273a, subd. (a); count 9); sodomy of J., who was a child 10 years of age or younger, the first time (§ 288.7, subd. (a); count 10); sodomy of J., who was a child 10 years of age or younger, the second time (§ 288.7, subd. (a); count 11); forcible lewd acts upon a child by sodomizing J. the last time (§ 288, subd. (b)(1); count 12); and child abuse of J. (§ 273a, subd. (a); count 13). As to counts 2, 3, 4, 5, 6, 7, 8, and 12, the People alleged defendant committed the offenses against multiple victims. (§ 667.61, subds. (a), (e)(4), (j)(2).)

A jury found defendant guilty on counts 2, 6, and 10. Additionally, the jury found defendant guilty on count 3 of the lesser included offense of attempted lewd acts upon a child. (§§ 288, subd. (b)(1), 664.) The jury also found true the multiple victim enhancement. The jury found defendant not guilty on counts 1, 4, 5, and 12. The jury was unable to reach a unanimous verdict on counts 7, 8, 9, 11, and 13, and the court declared a mistrial on these counts.

When the matter came on for sentencing, counts 7, 8, 9, 11, and 13 were dismissed on motion by the People. Additionally, the multiple victim enhancement was found inapplicable and stricken.

On count 10, the court sentenced defendant to a term of 25 years to life. On each of counts 2 and 6, the court sentenced defendant to consecutive terms of two years, eight months. On count 3, the court sentenced defendant to a consecutive term of one year, four months. Accordingly, defendant was sentenced to an aggregate term of 25 years to life plus six years, eight months.

## FACTS

Defendant and Melissa M. were in a romantic relationship for approximately 11 to 12 years, from 2002 to 2013. Beginning around 2005 or 2006, they worked for the same logistics company and frequently worked the same shift. Their relationship ended in August 2013 following an incident in which defendant "beat" Melissa, which later resulted in defendant's incarceration. Following this incident, Melissa had no interaction with defendant other than during court proceedings.

Melissa had two sons, J. and M. J. was born in May 2001, and M. was born in October 2002. Defendant was the boys' stepfather, although M. believed defendant to be his biological father until defendant told M. otherwise in August 2013.

## I. J.'s Testimony

J. was 16 years old at the time of trial. He testified that defendant was in his life from the time he was approximately seven months old until the night before he began seventh grade.

J. testified that defendant was physically abusive toward Melissa, J., and M. Defendant would hit J. with a variety of objects, but primarily used a homemade paddle. The beatings left bruises and scratches on J.'s body and once resulted in a split lip. At some point, defendant began disciplining the children by forcing them to eat ghost peppers, which J. described as the "hottest pepper[s] in the world." J. regularly returned from school to find Melissa beaten, scratched, or with a black eye. On the night before J. started seventh grade, he awoke to see defendant beating his mother with a towel rack in the bathroom.

4.

J. also testified that defendant "raped" J. and M. The first incident occurred when J. was "about five, maybe six" years old. Melissa was at work and J. and M. were at home playing on their Xbox when defendant told them to come into his room.[4] There, defendant pulled down his pants and the boys' pants, and told them to bend over. He then sodomized J. from behind while J. was bent over the bed. Afterward, J. took his clothes and ran from the room, while M. remained behind. The second incident occurred when J. was approximately eight years old. He was watching television when defendant told him to come into the master bedroom. J. complied and defendant sodomized him again. J. did not recall additional details regarding this incident. J. denied that any further incidents of sodomy occurred. He did not recall telling a forensic interviewer about a third incident of sodomy. He did not recall whether he ever saw defendant sodomize M.

Defendant told J. not to tell anyone about the sodomy, and J. was scared to do so. Eventually, M. told their grandmother he had been abused, and J. decided to reveal his own abuse. At the time of trial, J. lived with his grandfather and was no longer close with M.

During cross-examination, J. confirmed he did not like defendant and was upset defendant beat his mother. He confirmed he wished to hurt and kill defendant for beating his mother and putting J. and M. "through hell."

## II.    M.'s Testimony

M. was 15 years old at the time of trial. He had a good relationship with defendant until he began to see defendant act violently toward his mother. M. then began to hate defendant. Defendant would hit M.'s mother and throw things at her. Defendant also hit M. and J. with a homemade paddle, a back scratcher, a switch, or his fist.

---

**4**    According to J., his mother often went to work by herself while defendant stayed home.

M. also testified to sexual abuse by defendant. When M. was 11 or 12 years old, he and J. were playing a computer game when defendant asked M. to come into the hallway. Defendant told M. to touch defendant's penis and threatened to hit M. if he did not comply. Defendant put M.'s hand on his penis and defendant also tried to touch M. Defendant stopped when he heard a noise and M. then went back into his own room. During this incident, a computer was on the floor, and defendant put on a video of a man and woman having sex.

Approximately two months later, M. was in the living room watching television when defendant came in and began talking to him. Eventually, defendant moved M.'s hand near defendant. Defendant pulled his pants down and started to stand up. He tried to touch M.'s penis over his clothing. M. walked away, and soon thereafter his mother came home.

On one occasion, defendant asked M. to put his mouth on defendant's penis. M. did not do it. On another occasion, M. was in bed watching television with J., defendant, and defendant's son Glen.[5] Eventually, J. and Glen left the room and defendant tried to touch M. and told M. to touch defendant. M. could not recall what happened next.

M. also testified to conduct that involved defendant's adult sister, Ja.[6] On one occasion, defendant called M. into the master bedroom, where defendant and Ja. were in bed. Defendant had on a shirt but no pants, and Ja. was under the blankets. Defendant told M. to close the door and go to Ja.'s side of the bed. Defendant was rubbing his penis. Defendant told Ja. to touch M.'s private parts, and she unbuttoned M.'s pants and touched him under his clothes. Defendant then told Ja. to suck M.'s private parts, which

---

[5]    Glen is sometimes referred to in the testimony by his nickname, Galino.

[6]    In his forensic interview, M. described Ja. as "mentally retarded." Defendant testified that Ja. had a learning disability, which he attributed to her being born deaf. Defendant's mother testified that Ja. was "mildly mentally challenged with a learning disability and a regression disorder" resulting from having "died for over seven minutes" during surgery when she was five years old. Ja. was deceased at the time of trial.

she tried to do. Defendant also made M. put his fingers inside Ja. Defendant then told M. to get out of the room. M. left the room and closed the door.

A couple of weeks later, on the night before the first day of school, defendant and Melissa got into a big fight. At the time, Glen's wife Jennifer was living with M. and his family. On the night of the incident, defendant and Jennifer were swimming while Melissa slept. Eventually, Jennifer and defendant went into Jennifer's room. Melissa woke up and went looking for them, and found defendant naked in the closet in Jennifer's room. Melissa got mad and told them both to get out. Defendant hit Melissa, eventually hitting her with a towel rack. M. cried and yelled at him to stop. Defendant said to Melissa, "Tell him. Tell him. Tell him how I raised your bastard sons." Defendant then pushed M. into the living room, told him, "I'm not your real dad," and told him the identity of his biological father.

M. witnessed defendant using methamphetamine on three occasions. On one occasion, defendant asked M. if he wanted to try it and put a pipe to M.'s mouth. M. walked away.

M. eventually moved in with his grandmother. One day, M.'s grandmother asked M., "Did [defendant] ever hurt you or touch you in any kind of way?" M. started crying and told his grandmother of the abuse.

On cross-examination, M. acknowledged that he would like to see defendant locked up forever. M. stated that he did not hate defendant, because for most of M.'s life, defendant was his dad. M. also testified about fun family activities they did together.

### III. Law Enforcement Testimony

An officer with the Fresno Police Department took an initial statement from M. and his grandmother on November 18, 2014, and testified that M. reported two incidents of abuse that occurred while he lived with defendant. One incident involved Glen and Ja. and occurred while M.'s mother was hospitalized for a surgery. M. reported that defendant tried to get M. to touch Ja.'s private parts but that M. refused.

7.

An officer with the Fresno Police Department took an initial statement from J. on November 19, 2014,[7] and testified that J. reported five separate instances of sexual abuse, as well as regular physical abuse. J. reported that defendant touched the boys' genitals and anus while touching himself and also put his penis into J.'s anus. J. reported that the incidents occurred between October 2007 and April 2009.

## IV. Forensic Interviews

J. and M. underwent forensic interviews, recordings of which were played for the jury.

In J.'s interview, J. reported that defendant sodomized him three times, with the first instance occurring when J. was approximately five years old. In the first instance, M. was present, and defendant also sodomized M. after he sodomized J. In the second instance, defendant told J. to bring M. into the room after defendant sodomized J. Although J. recalled a third instance of sodomy, he did not recall any of the surrounding details.

In M.'s interview, M. reported that, when he was approximately nine years old, he and J. were playing a computer game when defendant pulled M. out of the room and showed M. pornography on a computer. Defendant pulled down his pants and tried to make M. touch his penis. M. kept pulling his hand away until defendant got mad and sent M. back to his room. On a second occasion, defendant took M.'s hand and made M. touch defendant's penis. Defendant told M. to orally copulate him and M. refused. Defendant became angry and began to search for pornography on the computer. At that point, M.'s mother came out and became angry that M. was awake, so M. ran to his room.

---

[7] The officer testified that this information was told to her by "a young boy" whose name was confidential, and therefore not in her report or known to her. However, the parties stipulated the boy was J. Defendant's assertion that the evidence does not establish the boy was J. is without merit.

M. also reported that defendant and Glen would do to Ja. what "the guys and the girls did in the videos." On one occasion when M.'s mother had surgery and was away from home, M. heard Glen, Ja. and defendant in his mother's bedroom. Ja. sounded like she was crying. M. accidentally opened the door and saw that Ja. was not crying and was under the covers. Defendant was partially on the bed, and was wearing sweatpants and no shirt. Glen was partially clothed and was standing by the closet. Defendant told M. they were doing "what the guys and the people in the movie were doing," and made M. swear not to tell anyone. Ja. undid M.'s pants and defendant tried to take off M.'s boxers. Ja. touched M.'s penis and also orally copulated him. Defendant told M. to touch Ja., and defendant put M.'s hand on her "upper privates" and squeezed. Defendant put his fingers inside of Ja., and defendant then held M.'s hand and put it "in and out the inside of [Ja.]" in her "lower part." Defendant then sent M. out of the room to watch Glen's children.

On another occasion, defendant used a "pink thing" that vibrated and was shaped like a penis to penetrate M.'s anus while defendant touched himself. On a separate occasion, defendant had M. put the pink thing in defendant's anus while defendant touched himself.

## V.     Expert Testimony

David Love testified for the People as an expert in the field of child sexual abuse accommodation syndrome (CSAAS) and the neurophysiology of trauma. He had not reviewed any reports related to the case, met with defendant or the victims, or been told any specifics about the case.

Love identified five key areas of child sexual abuse accommodation syndrome: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and/or unconvincing disclosure; and retraction.

Love testified to various statistics regarding molested children. He explained that 94 percent of molested children had a preexisting relationship with the offender. Additionally, a majority of molestations happen in the home or another location the child

normally occupies. Love explained that 74 percent of children in a particular study did not disclose molestation within one year after being been molested and 50 percent did not disclose within five years. Love also was familiar with children who waited at least 12 years to disclose. In the same study, 42 percent of children had partial amnesia, and 20 percent had total amnesia for a period of time. In one study of 320,000 children whose cases went to trial, researchers were able to identify only 1 percent of cases where information or evidence in the case files supported a conclusion that the report was false. Love acknowledged that the number of false reports may have been higher than identified, but opined that the number of instances "where kids lie or information is totally erroneous" was "certainly extremely low." Love opined, based on his review of the relevant research, that it is rare for children to fabricate allegations of molestation. Love stated that tools had been developed to try to determine whether a child's allegation was false, but those tools had been determined to be insufficiently accurate to be allowed into evidence in court proceedings.

## VI.     Defense Case

Defendant testified on his own behalf and denied that he touched J. or M. He acknowledged that he disciplined the boys by spanking them with a paddle. "More often than not," he disciplined the children because Melissa asked him to. He disciplined the boys approximately once a month.

Defendant explained that he and Melissa often worked together until he went on disability in 2012. At that point, defendant began drinking heavily. Defendant acknowledged using methamphetamine approximately once per month, but denied ever trying to make M. smoke methamphetamine.

Defendant acknowledged that Melissa had surgery in approximately May of 2013, and that Ja. visited the house while Melissa was in the hospital. According to defendant,

Ja. was accompanied by defendant's mother and his niece, Nakita.[8] Defendant's mother left the house at some point that day, and Ja. and Nakita stayed behind. Also present were defendant's son Glen, and Glen's wife, Jennifer. Defendant denied molesting Ja., letting M. touch Ja., or making Ja. touch M.

Defendant acknowledged that he had sex with Glen's wife Jennifer on and off over the course of approximately three years. Glen also asked Jennifer to have a "three-way" with defendant and Glen.

Melissa testified that she did not strike or discipline the children or ask defendant to do so. She acknowledged that she had surgery in May 2013 that resulted in her being hospitalized for three days. At that time, Glen and Jennifer were living with Melissa and defendant. She further testified that defendant used methamphetamine daily from 2005 through 2013. At the time of trial, Melissa had guardianship of Glen and Jennifer's two children.

Melissa's father testified that he previously got along well with defendant and had not seen visible injuries on the children, other than red welts on J.'s buttocks.

Defendant's mother Pamela testified that she took Ja. and Nakita to defendant's house on the day Melissa had surgery and left them there with defendant, Glen, Jennifer, Glen and Jennifer's two children, and Jennifer's daughter from a different relationship. She did not notice anything wrong with Ja. when she picked her up. Pamela also testified that she had seen Melissa physically discipline the boys, as well as one of Glen and Jennifer's daughters, by hitting them with the heel of her hand. Pamela denied that defendant had a sexual relationship with Ja. but testified it was possible he had a sexual relationship with Jennifer and that he and Glen requested a "three-way" with Jennifer.

---

[8]     Nakita is sometimes referred to in the testimony as Nicki.

Nakita testified for the defense and identified defendant and Ja., respectively, as her brother and sister. Nakita testified that she had seen Melissa hit the boys with the heel of her hand and kick them with her boot, and that Melissa had threatened to beat Nakita up the week before Melissa had surgery. Nakita also testified that defendant and Ja. did not leave her sight on the day of Melissa's surgery.

## VII. Rebuttal Evidence

Jennifer testified that she married Glen in 2012 and remained married to him at the time of trial, although she hated him. She, Glen, and their two children lived with defendant, Melissa, J., and M. off and on for approximately two and a half years. During that time, Jennifer used methamphetamine daily and had used methamphetamine with defendant.

Jennifer testified that, on one or two occasions, she had walked in on Glen orally copulating Ja. while defendant watched. In 2011 or 2012, Jennifer had a "threesome" with defendant and Glen. On another occasion, Jennifer orally copulated defendant, and Melissa walked in on them. On another occasion, defendant told Jennifer that when her daughters were old enough, "he would show them it was okay to have intercourse with family members." Glen was present for this statement and did not object.

At the time of trial, Jennifer was in an inpatient drug and alcohol rehabilitation program. She lived with Melissa for approximately two weeks immediately prior to entering this program.

## DISCUSSION

### I. Ex Post Facto Challenge

Defendant contends his sentence of 25 years to life on count 10, imposed pursuant to section 288.7, subdivision (a), violates the ex post facto clauses of the United States and California Constitutions because the evidence permitted the jury to find that the offense occurred before September 20, 2006, the effective date of section 288.7. Upon review of the evidence, we cannot conclude beyond a reasonable doubt that the offense

alleged in count 10 occurred after the effective date of section 288.7. Accordingly, we must vacate the conviction and sentence on this count.

### A. Applicable Law

"Both the California and United States Constitutions proscribe ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)" (*People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1178 (*Alvarez*).) "A statute violates the prohibition against ex post facto laws if it punishes as a crime an act that was innocent when done or increases the punishment for a crime after it is committed." (*People v. White* (2017) 2 Cal.5th 349, 360; accord, *Collins v. Youngblood* (1990) 497 U.S. 37, 41-42.)

Section 288.7 became effective on September 20, 2006, and "created a new offense which imposes an indeterminate life sentence for sexual intercourse, sodomy, oral copulation, or sexual penetration of a child who is 10 years of age or younger." (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306; see Stats. 2006, ch. 337, § 9.) "Therefore, any application of section 288.7 to conduct that occurred prior to September 20, 2006, is a violation of the state and federal ex post facto clauses." (*Rojas*, at p. 1306.)

To avoid an ex post facto violation, the People must prove to the jury that the defendant committed the offense on or after September 20, 2006, the effective date of section 288.7. (See *Rojas*, *supra*, 237 Cal.App.4th at p. 1306; *People v. Hiscox* (2006) 136 Cal.App.4th 253, 260 (*Hiscox*).) Where the jury was not instructed to find that an offense occurred on or after the effective date of the statute, and did not, in fact, make such a finding, we consider whether the evidence "leaves no reasonable doubt" the offense occurred on or after that date. (*Hiscox*, at p. 261; see *Rojas*, at p. 1306.) A reviewing court may not "infer that certain acts probably occurred after that date," or "hypothesize . . . what dates might be attached to certain acts based on ambiguous evidence." (*Hiscox*, at p. 261.)

An ex post facto violation resulting in an unauthorized sentence can be raised on appeal even where the defendant failed to object below. (See *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

**B.      Analysis**

Here, the first amended information alleged that count 10 occurred "[o]n or about May 17, 2006 through May 16, 2008," when defendant engaged in sodomy with J. for the first time. The verdict form asked the jury to determine whether defendant committed this offense, as alleged in the first amended information. The jury was not instructed that it must find the relevant act occurred on or after September 20, 2006, in order to find defendant guilty, and the verdict form did not require the jury to make such a finding, or any other finding with respect to the timing of the alleged act.[9]

The evidence at trial was not conclusive with respect to the date the sodomy alleged in count 10 occurred. J. testified defendant's first act of sodomy occurred when J. was approximately five years old. Because J. was born in May 2001, this testimony would allow a finding that the first act of sodomy took place sometime between May 2006 and May 2007, a period that falls both before and after the effective date of section 288.7. J. also told a forensic interviewer that the first instance of sodomy occurred when he was five years old, probably after he started school. This evidence likewise does not establish the offense was committed on or after September 20, 2006. It is therefore plausible that the jury found defendant guilty based on an act that occurred before September 20, 2006.

---

[9]      The court indicated it was disinclined to instruct the jury with CALCRIM No. 207, which informs the jury the People are not required to prove the offense took place on the date or dates alleged. (CALCRIM No. 207.) The People subsequently withdrew their request for this instruction.

As the People point out, the jury also was presented with evidence to suggest the first act of sodomy may have occurred well after September 20, 2006. J. told an officer that defendant began molesting the children in October 2007, and later progressed to sodomizing him. J. also told the forensic interviewer that the second incident of sodomy occurred approximately a year and "a few months" after the first, and later testified the second incident occurred when he was approximately eight years old. This evidence, if believed, would suggest the first act of sodomy occurred in 2007 or 2008. The jury could have relied on this evidence to conclude the first instance of sodomy occurred after September 20, 2006. However, the jury was not asked to make such a finding, and we have no basis to conclude it did so. Nor may we pick and choose among conflicting pieces of evidence to hypothesize as to when the offense occurred. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 261.) It is not enough that the offense possibly, or even probably, occurred after the effective date. (*Ibid.*; accord, *Rojas*, *supra*, 237 Cal.App.4th at p. 1307.)

Because we cannot conclude beyond a reasonable doubt that defendant was found guilty based on an act that occurred on or after September 20, 2006, we must reverse the conviction and sentence on count 10.

## II. Expert Witness Testimony

Defendant contends Love's expert testimony on statistical data involving child molestation victims improperly suggested J. and M. were truthful in their allegations. The People concede Love was improperly permitted to testify regarding the infrequency with which children fabricate molestation allegations, but argue the testimony was harmless. As we explain, we accept the People's concession as to the testimony regarding fabrication, but conclude Love's remaining statistical testimony was permissible. Regardless, we conclude all of Love's statistical testimony was harmless.

### A. Forfeiture

Defendant did not object to Love's statistical testimony in the trial court.

In the trial court, Love was disclosed as a witness only a few days prior to trial, and defendant objected to his testimony on the basis of untimely disclosure.  (§§ 1054.1, 1054.7.)  The trial court refused to disallow Love's testimony, but offered defendant the opportunity to continue trial, which would have required a waiver of defendant's speedy trial rights.  Defendant declined a continuance.

Prior to Love's testimony, the defense lodged a continuing objection to Love being permitted to testify, but not to any of his specific testimony.  During Love's testimony, the defense objected only once, to testimony not at issue here.

Following the close of evidence, the court instructed the jury based on CALCRIM No. 306 that the People failed to timely disclose Love as a witness, and that the jury could consider the late disclosure in evaluating the weight and significance of his testimony.

Defendant made no specific objection to the testimony he now complains of, and the issue is therefore forfeited.  (See *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].)  Nonetheless, the People do not ask us to dispose of the issue on forfeiture grounds, and instead address the claim on the merits.  Furthermore, defendant urges us to reach the issue on several grounds, including ineffective assistance of counsel.  We also note that two relevant Court of Appeal cases regarding the admissibility of statistical evidence of fabrication were decided after defendant's trial.  (*People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*); *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*).)  We will therefore exercise our discretion to address the issue on the merits.  (See *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.)

**B.  Applicable Law**

We review decisions regarding the admissibility of expert testimony for abuse of discretion.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).)  Expert

testimony regarding CSAAS has long been held admissible in cases involving child sexual abuse, although such testimony is subject to certain limitations.  (See *McAlpin*, at pp. 1300-1301.)  We review the relevant case law.

In *People v. Bowker* (1988) 203 Cal.App.3d 385, 389-390 (*Bowker*), an expert witness testified to the "five stages" of CSAAS, the difficulties facing child witnesses, and the importance of believing child victims.  The Court of Appeal held that CSAAS evidence could not be used as a "*predictor* of child abuse," but was potentially permissible to explain that a certain characteristic or behavior is "not inconsistent with a child having been molested."  (*Id*. at p. 393.)  The court characterized as improper " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused."  (*Ibid*.)  Instead, the court held that such testimony must be offered "to rebut a defendant's attack on the credibility of the alleged victim(s)" by, for example, rebutting a myth or misconception suggested by the evidence.  (*Id.* at pp. 393-394, fn. omitted.)  The court concluded the expert's testimony regarding the credibility of child victims was improper, as was his testimony providing a predictive " 'scientific' framework" the jury could use to evaluate the facts of the case and to conclude abuse had occurred.  (*Id*. at pp. 394-395.)

In *McAlpin*, a police officer testified as an expert in child molestation investigations that it was not unusual for a parent to refrain from reporting a known molestation of his or her child.  (*McAlpin*, *supra*, 53 Cal.3d at pp. 1298-1299.)  Our Supreme Court analogized such testimony to expert testimony on common reactions of rape victims and sexual molestation victims, which the court noted is admissible to rehabilitate a complaining witness whose credibility has been impeached by the suggestion that his or her conduct after the incident was inconsistent with rape or molestation.  (*Id*. at pp. 1300-1301.)  Citing with approval to *Bowker*, *supra*, 203 Cal.App.3d at pages 390 through 394, and other appellate cases, the high court held such

17.

testimony is admissible to correct " 'commonly held misconceptions' " about abuse and to explain witness behavior. (*McAlpin*, *supra*, at pp. 1300-1301.) Accordingly, the court held the officer's testimony was admissible for the limited purpose of rehabilitating the credibility of the victim's mother, who had delayed reporting the molestation of her daughter. (*Id*. at p. 1302.)

In *Wilson*, an expert witness testified regarding CSAAS, including the five elements of CSAAS and common myths about child sexual abuse. (*Wilson*, *supra*, 33 Cal.App.5th at p. 566.) The witness "explained that CSAAS is not a tool to determine whether a child has been abused." (*Ibid*.) However, the witness also testified to statistics regarding false allegations, including a study in which the incidence of false allegations was approximately 4 percent. (*Id*. at p. 568.) The witness testified to other studies, which found false allegations in 1 to 6 percent of cases. (*Ibid*.) The witness opined that false allegations happen infrequently or rarely and, in his own experience, he had come across only two cases in which he believed a child falsely alleged sexual abuse. (*Ibid*.) The Court of Appeal concluded this testimony had the practical effect of suggesting to the jury there was an overwhelming likelihood the testimony of the victims was truthful and, in so doing, improperly invaded the province of the jury to draw the ultimate inferences from the evidence.[10] (*Wilson*, at p. 570.) Additionally, the evidence was not helpful to the jury in determining whether the particular allegations before it were false, and the evidence was therefore irrelevant and more prejudicial than probative. (*Id*. at p. 571.) Accordingly, the Court of Appeal determined the admission of the evidence constituted an abuse of discretion. (*Ibid*.)

---

[10] The court reviewed cases from other jurisdictions that reached the same conclusion in similar circumstances. (*Wilson*, *supra*, 33 Cal.App.5th at pp. 568-570.)

*Julian* involved the same expert witness as *Wilson*, *supra*, 33 Cal.App.5th at page 566, who gave similar testimony regarding CSAAS and more extensive testimony regarding the infrequency of false allegations. (*Julian*, *supra*, 34 Cal.App.5th at pp. 882-884.) Relying on *McAlpin* and *Bowker*, the Court of Appeal concluded the statistical testimony regarding false allegations was not admissible. (*Id*. at pp. 885-886.) Additionally, relying on cases from other jurisdictions, the *Julian* court concluded the statistical testimony on false allegations supplanted the jury's decision on whether the victims were credible, and thereby deprived the defendant of a fair trial. (*Id*. at pp. 886-887.)

## C.     Analysis

The People concede Love was improperly permitted to testify regarding the infrequency of false molestation allegations by children. We accept the People's concession that this testimony was improperly admitted under the reasoning of *Wilson*, *supra*, 33 Cal.App.5th 559, and *Julian*, *supra*, 34 Cal.App.5th 878.

Defendant also challenges Love's remaining statistical testimony regarding victims of molestation, including that: 94 percent of molested children had a preexisting relationship with the offender; a majority of molestations happen in the home or another location the child normally occupies; 74 percent of children in a particular study did not disclose molestation within one year after having been molested and 50 percent did not disclose within five years; some children waited at least 12 years to disclose; and 42 percent of children in a particular study had partial amnesia, and 20 percent had total amnesia for a period of time. Like the testimony regarding false reporting, defendant argues this testimony improperly bolstered the complainants' credibility. The People do not address this argument.

We disagree with defendant's assessment that this statistical evidence improperly suggested J. and M. were telling the truth. This evidence did not suggest the molestation allegations were true. Additionally, Love testified he did not review any of the facts of

this case.  The jury was instructed that Love's testimony concerning CSAAS was not evidence defendant committed any of the crimes charged against him, and could only be used in deciding whether J.'s and M.'s conduct "was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." The jury thus was not, as defendant suggests, improperly presented with a " ' "scientific" ' framework into which [it] could pigeon-hole the facts of the case." (Citing *Bowker*, *supra*, 203 Cal.App.3d at p. 395.)

Furthermore, our Supreme Court has held that this type of evidence is admissible for the limited purpose of evaluating whether a complainant's conduct was inconsistent with being a victim of abuse.  (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1302.)  The jury was so instructed.  We therefore conclude the statistical testimony (aside from the testimony regarding false allegations) was permissible to explain J.'s and M.'s behavior following the molestation and to show their behavior was not necessarily inconsistent with having been abused.  (*Ibid*.; accord, *People v. Wells* (2004) 118 Cal.App.4th 179, 187-190 [CSAAS testimony is admissible so long as it is not used to show sexual molestation actually happened, and is used for the limited purpose of disabusing a jury of misconceptions it might have about how a child reacts to molestation such as delayed reporting of the alleged molestation].)  Indeed, we are precluded from deciding otherwise.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Accordingly, although Love's testimony regarding the incidence of fabrication was improper, the trial court did not abuse its discretion in admitting Love's other statistical testimony regarding the behaviors of child sexual abuse victims.  Regardless, as we explain below, the admission of Love's statistical testimony was harmless under any standard of review.

### D.    Prejudice

The standard of prejudice for evaluating the effect of improperly admitted CSAAS testimony is unresolved.  In *Wilson*, the court rejected the defendant's argument that such

error should be evaluated under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, noting that our Supreme Court had applied the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, in similar circumstances. (*Wilson*, *supra*, 33 Cal.App.5th at p. 571.) In contrast, in *Julian*, the court reversed on the ground that the expert's testimony regarding the infrequency of false allegations denied the defendant a fair trial and was prejudicial under any standard. (*Julian*, *supra*, 34 Cal.App.5th at pp. 886, 889-890.) We need not resolve the applicable standard here because Love's testimony was harmless, even under the more stringent *Chapman* standard. Defendant was not denied a fair trial, and we are convinced beyond a reasonable doubt that the jury would have rendered the same verdict, even absent Love's erroneously admitted testimony. (See *People v. Merritt* (2017) 2 Cal.5th 819, 831 ["We must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error."]; *People v. Pearson* (2013) 56 Cal.4th 393, 463 [the relevant inquiry under *Chapman* is " ' "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' "].)

Love's testimony on false allegations during direct examination was brief, particularly in the context of his remaining CSAAS testimony and the rest of the prosecution's case. His testimony on other statistics likewise was brief. Although defense counsel addressed the statistics regarding false allegations at length on cross-examination, she did so in a manner that cast doubt on the ability of the studies to actually determine whether a particular claim was false.[11] The prosecution briefly referenced Love's statistical testimony in closing argument: "[Love] explained that most kids don't usually fabricate these types of things." However, defense counsel responded

---

**11**    In contrast, in *Julian*, defense counsel's "questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about a statistical certainty that defendants are guilty." (*Julian*, *supra*, 34 Cal.App.5th at p. 889.)

that Love "obviously [had] a little bias," and that his testimony was "based on quicksand." Defense counsel also pointed out that the researchers "start out by believing any child" who reports sexual abuse and assume those allegations are true if the allegations reach a certain point in the court process. The brief nature of Love's statistical testimony and defense counsel's targeted cross-examination and argument support a finding of harmless error.

Most significant to our analysis, however, is the jury's verdict itself. The jury found defendant guilty as charged on three counts involving sexual abuse, and guilty on one count as a lesser included sexual offense. However, the jury found defendant not guilty on four counts involving sexual abuse.[12] The not guilty verdicts make clear that the jury did not improperly rely on Love's testimony to resolve the witness's credibility or presume defendant was guilty based on statistical probabilities. Rather, the jury fulfilled its responsibility to determine witness credibility and, in so doing, determined that some of the sexual allegations made by J. and M. were not proved beyond a reasonable doubt. They did so even in the face of testimony by Love that false allegations are extremely rare. Had the jury understood Love's testimony to mean that J. and M. were telling the truth and that defendant was lying, or had Love's testimony truly invaded the jury's province to decide the witness's credibility, the jury could not have acquitted defendant on these counts. We therefore are convinced beyond a reasonable doubt that the verdict actually rendered was not attributable to the erroneous admission of Love's testimony.

The error was harmless.

---

**12**      Additionally, the jury hung on three counts involving sexual abuse and two counts involving child abuse.

22.

## **DISPOSITION**

The conviction and sentence on count 10 are reversed and the matter is remanded for resentencing on the remaining counts.  In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


MEEHAN, J.